## L. & N. R. R. Co. v. Murphy.

(Decided March 18, 1911.)

### Appeal from Kenton Circuit Court (C. C. L. and E. Division).

1. Personal Injuries—Action for Damages—Peremptory Instruction.— Plaintiff, an engineer on a freight train, was injured by running into a landslide, and brought this action against the defendant to recover damages. He based his right to recover on the theory that the condition of the right of way and of the weather was such that a landslide could be naturally anticipated at the time and place of the accident, and that defendant was negligent in not providing a watchman for slides, and warn approaching trains. The evidence showed that the accident occurred at 2:18 p. m., at which time the track was clear and no slide had taken place. For a distance of 350 feet before reaching the place where the slide occurred, the track was straight. Plaintiff was keeping a lookout. He testified that he was only 136 feet distant when he discovered the slide, and the earth was still falling. Held that the only reasonable inference deducible from the proven facts is that the slide occurred when plaintiff was only a few feet away, and at a time when a watchman, even if present, could not have warned plaintiff in time to have enabled him to stop the train. That being true plaintiff failed to show that defendant was guilty of any negligence that caused his injuries, and a peremptory instruction was proper.

2. Contributory Negligence.—A freight engineer whose schedule time is from 15 to 18 miles an hour, and who in defiance of orders to reduce his speed at cuts where landslides may be expected, increases his speed from eight to ten miles an hour, and runs into a landslide, causing his engine to jump the track, turn over and injure him, is guilty of contributory negligence that will prevent a recovery.

S. D. ROUSE and BENJAMIN D. WARFIELD for appellant.

WM. A. BYRNE for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

Appellee John J. Murphy brought this action against appellant Louisville & Nashville Railroad Company to recover damages for personal injuries alleged to have been due to its negligence. The jury returned a verdict in his favor for $15,000.00, and the railroad company appeals.

Appellant's principal ground for reversal is the failure of the trial court peremptorily to instruct the jury to find for it. In view of the conclusion of the court, this question alone will be considered.

At the time of the accident appellee was forty-four years of age, in good health, and had been running an engine for about eighteen years. When he was injured, he was in charge of engine 1201, hauling freight train No. 42, consisting of thirty cars and a caboose. The train was en route from Corbin to Covington. Upon reaching a point about sixty feet north of mile post 47 and seven miles south of Falmouth, Kentucky, the engine ran into a landslide which covered the track for a distance of fifteen or twenty feet and to a depth of about two feet. Upon striking the slide and running through the earth for a few feet, the engine left the track, turned to the left, and ran down the embankment to Licking River, a distance of about seventy-five feet, and turned upside down. Appellee was severely injured, and, in the opinion of a physician of high standing, is now a helpless cripple.

The accident happened at a place called Uma. In this vicinity there is a steep cliff on the east side of appellant's right of way as you proceed north. The earth upon the side of the cliff is cracked, the cracks running parallel with each other for a distance of several hundred feet on each side of the place where the accident occurred. Though the day of the accident was bright and clear, it had been raining off and on for some time before. Several landslides had occurred in the vicinity and the character of the earth was such that a landslide could be expected in wet weather. Up to within a few days of the accident appellant had had a watchman there both day and night. When the accident occurred appellant's section foreman and three men had charge of six miles of track, embracing the track at the place of the accident and, in addition to this force, John Crowe, an extra gang foreman, with a crew of sixteen men, was constantly at work in the vicinity of Uma, taking out slides and straightening the track if it got out of shape. Early in the morning this extra gang of men, whose duty it was to watch for slides, were at work about 250 yards south of where the slide took place. When the wreck occurred, Justice and his men were at work at Levingood, nearly a mile distant. Crowe and his men had gone to mile post

to remove a slide. None of his men were left at the place of the accident. It appears that one of Justice's men passed by about ten o'clock in the morning, and this is the last time that any of appellant's track employes were in the immediate vicinity.

Appellee testified that, as near as he could remember, he passed Boyd Station, which is six miles from Uma, at a speed of between twenty-two and twenty-five miles an hour. After leaving Boyd Station the fire got away from the fireman and the steam got low. In going up the overhead bridge he made the engine labor hard. When he got over the hill and through Blue Rock Cut, he used steam on the straight line. He then gave the train a good start and shut off the throttle driving down Boyd Hill. Going into Morgan he reduced the speed. After reducing the speed and getting around the curve, he opened up the throttle again and went after the engine pretty strong. He then drove down the Morgan straight line, and in going into Uma sounded a long whistle. On passing Uma he looked at his watch, and it was 2:18 p. m. He then closed his watch and was standing with his hands on the throttle, looking out the window of the engine. On reaching a point a little beyond the other side of Johnson bridge he could see something ahead down the hill—something he had never seen there before. By that time he was around the curve, and the track was thrown out of line. He threw on the emergency brake and halloaed to his fireman to look out for that slide. The fireman was down in the hole in the deck. He told the fireman to stay on. The engine then struck the track, which was out of line, and appellee remembered nothing more that took place. In approaching the place of the accident he did not see any flag or run over any torpedoes. Witness then described the character and extent of his injuries. Appellant had kept a watchman at this place to watch for slides. Had there been a watchman there the watchman could have flagged him, as there was a little over two miles of straight track. There was a sharp curve a little to the south of the place of the accident. He was on the curve when he saw the track was out of line, and saw the dirt and stuff down on it and more coming. He was four or five car-lengths away when he first saw the slide. On cross-examination, appellee stated that he was familiar with appellant's line of railway on which the derailment occurred, and with its nat-

ural condition. There had been rain during the month of February. While he did not know that the point of accident was a bad place, he did know that the ground there had slipped away. Appellee admitted receiving and signing the following bulletin orders:

"Form 49.

Louisville and Nashville Railroad Company.

Special Telegraphic Bulletin Order No. 198.

Sent from Paris, Ky., Feb'y 5, 1908.

To All Trains:

All trains will run cautiously at all cuts, hillsides and other places where there is possibility for a slide, fall or washout.

(Signed)          W. O. Chambers."

"Your attention is called to my bulletin No. 198, to reduce speed at all cuts, hillsides and other places where there is a possibility of a slide, fall or washout. Rocks reported falling very bad in Blue Cut, south of Brush creek. Run very cautiously through this cut looking out for rock.

(Signed)          W. O. Chambers."

The average schedule time of appellee's train was fifteen to eighteen miles per hour. According to his best judgment he was running about twenty-five miles per hour after leaving Morgan Station. At the time he had in mind the fact that the master of trains had issued a special bulletin because of the weather conditions, and was looking out for places where slides were liable to occur. When he first saw the slide he was four or five car-lengths from it, or a distance of about 136 feet. When he got around the curve he saw the track was out of line and saw the dirt sliding, too; that is, he saw that part that had not already come down still sliding. The company had had a watchman there patrolling the place several days and nights, and he was there the night before appellee was hurt. Whenever there was a slow-order put out, it was to look out for a bad place. There was one out for the slide north of where the accident occurred. When that slide was cleared away trains had a right to resume their regular speed. No order had been given contrary to the bulletin put in evidence. That portion of the road where the accident occurred was good for general speed; there was no slow-order out on it at

all. The bulletins put in evidence were still in effect at the time of the accident.

Appellee's fireman testified that, just before the accident, he was down in the deck of the engine putting in coal, and was not in position to see ahead. He fixes the speed of the train at from twenty-two to twenty-three miles an hour. The train had been running at that speed for, at least, three or four miles before the accident. Murphy applied the brakes about a second before he went into the slide.

William Hamilton, who was on the engine at the time and on the fireman's side, halloaed when he saw the slide, but was so excited he hardly knew what happened. He did not know the speed of the train. He heard Murphy putting on the emergency brake.

The conductor, who testified for appellee, stated that he was observing the speed of the train at the time the accident occurred. It was well under control and was going at the rate of about twenty-five miles an hour. In his opinion the train struck the slide in from three to five seconds after the emergency brake was put on. After the derailment the engine ran thirty or forty yards down the embankment.

Thomas Maloney, track supervisor, testified that it was raining the day and night before the accident. The place was always watched in wet weather, day and night. There was no watchman there the day of the accident.

The evidence for appellant, given by its civil engineer, is to the effect that, beginning about 400 feet from Johnson Creek, the track runs for 300 feet with a 3 degree 20 minute curve. For the next 300 feet the curve is 2 degrees 30 minutes. For about 500 feet the curve is 1 degree; and from that point on to the place of the accident there are 350 feet of absolutely straight track. Two young men, who were just across the river from where the accident occurred, testified that "the train was running awfully fast at the time of the accident." Just before the accident they saw a man run up the track and then back again. One of the witnesses testified that this occurred probably twenty minutes before the train reached there; though the other stated that the man going up and down the track was what attracted his attention to the coming train. Several other witnesses testified to the fact that the train was going very fast. C. H. Ray, appellant's general master

mechanic, made a test with the same engine used by appellee on the day of the accident, by placing a man in the middle of the track, and found that a man so stationed could be seen by the engineer when within 1,032 feet of the place of the accident. From the fireman's side the obstruction on the track could be seen 1,197 feet away. The engineer of local freight train No. 90, which was in front of train No. 42, testified that he passed the place of accident at 1:40 p. m., and the track was then in good condition. Ben Powell, a farmer living near Levingood, was present when Ray and others made their tests, and corroborates their evidence as to the distances, etc. On cross-examination he stated that he made his observations from the inside of the engine, and not while leaning out of the window.

At the conclusion of all the evidence, appellant again asked for a peremptory instruction.

Appellee has not based his case upon the theory, nor did he introduce any evidence tending to show, that appellant could by the exercise of ordinary care have taken any precautions to prevent the landslide. He bases his right to recovery solely on the theory that appellant was negligent in failing to have a watchman at the place of the accident to look out for the slide and to warn him in time to have enabled him to stop his train. That being true, appellee's case depends on whether or not the slide occurred a sufficient length of time before the accident to have enabled a watchman or flagman to give the required warning in time to have afforded appellee a reasonable opportunity to check the train.

For appellee, it is insisted that the fact that a man was seen walking up and down the track a few minutes before the accident, is evidence of the fact that the slide had then taken place. Such a conclusion, however, is a non sequitur. It by no means follows that a landslide has taken place because a man is seen to run or walk up and down a railroad track. Indeed, if a slide had taken place, a person in a position to see it would not, naturally, content himself with simply walking up and down the track; he would be apt to take some steps to notify approaching trains of the condition of the track. Where a presumption naturally follows from proven facts, it would be proper to indulge it. Under the facts of this case, however, the inference is too strained to be allowed; it amounts to nothing more than a mere conjec-

ture. That being true, resort must be had to other facts in evidence to determine when the landslide occurred. A train had passed the place of the accident at 1:40 p. m., at which time the track was clear.

The uncontradicted evidence shows that there were 350 feet of straight track just before reaching the place where the wreck occurred. Therefore, there was nothing to prevent appellee from seeing the condition of the track for that distance. He claims that he was about 136 feet from the place where the track was out of line when he first saw it. As he was on the lookout and could have seen the debris upon the track for, at least, 200 feet prior to the time that he did see it, there must be some reason why he did not see it sooner. This can only be accounted for by the fact that the landslide occurred almost immediately in front of the engine. This conclusion finds support in appellee's own testimony, that the earth was still sliding when he saw the track was out of line. Instead then of the proven facts tending to show that the landslide took place some time prior to the accident, they all lead to the irresistible conclusion that it occurred when appellee's engine was only a few car-lengths away. That being true, no flagman nor watchman could have given appellee any kind of warning in time to prevent the accident. Appellee, himself, received notice of the landslide as soon as any watchman could have done, and he put on the emergency brakes more quickly than he could have done had he received warning through a watchman or flagman. Indeed, he knew of the landslide as soon as it took place. It was then too late to stop the train. It follows, then, that he was injured, not because of appellant's negligence in failing to have a watchman or flagman at the place of the landslide, but because of an unfortunate accident which appellant could not have prevented.

There is another feature of the case which prevents a recovery. Appellee knew that, under the bulletin orders which he admits having received, and which were still in force, it was his duty to reduce the speed of his train at places such as that at which the accident occurred. He admits that his schedule time was from fifteen to eighteen miles an hour; he also admits that he was running about twenty-five miles an hour. The conductor of the train places the speed at the same rate; the fireman fixes it at from twenty-two to twenty-three

miles an hour. Disregarding entirely the evidence for appellant, which tends to show that the train was going at a much faster rate, we have a case where appellee's own evidence shows that the train was going at from twenty-two to twenty-five miles an hour. Instead, then, of complying with the bulletin orders and reducing his speed, he violated those orders and actually increased his speed from eight to ten miles an hour. His statement, then, that he was proceeding cautiously, with the bulletin orders in mind, can not be given much weight, when his own evidence shows that he was flagrantly violating those orders. From these facts, we conclude that appellee was guilty of contributory negligence as a matter of law.

It follows that the court erred in failing to give the peremptory instruction asked for by appellant.

Judgment reversed and cause remanded for a new trial consistent with this opinion.