## Louisville & Nashville Railroad Company v. Murphy.

(Decided October 24, 1912.)

### Appeal from Kenton Circuit Court (C. L. & E. Division).

1. Evidence—Hearsay.—Where the vital fact in a case, was how far a train was from a land slide into which it ran when the land slide occurred, it was not competent to permit an employe of the company to testify as to information given to him shortly before the land slide occurred conducing to establish that when it occurred the train that ran into it was some distance away, although the person who gave the information was dead at the time of the trial.

2. Evidence—Hearsay Rule.—When conversations are properly excluded because they are hearsay, then every material act that the witness did that had it sole origin in the hearsay statement made to him should likewise be rejected, because if a witness could relate what he did on the faith of hearsay statements the whole of what occurred might as well be admitted, as any person of ordinary intelligence could readily supply the excluded conversation by inferring that the witness would not have acted as he did if the excluded statements had not been made to him.

3. Evidence—Hearsay Rule.—The reason for rejecting hearsay evidence is that something which should have come from an original witness is sought to be put in at second-hand by one to whom it has been told without the opportunity of confronting or cross-examining the person whose repeated statements the witness is testifying to.

4. Trial After Peremptory Instruction Is Directed to Be Given.—When there is a re-trial after a peremptory instruction has been directed by this court, if the evidence is the same, the trial court should give a peremptory instruction, but if on the second trial the evidence is materially different from what it was on the first trial, the case should go to the jury.

S. D. ROUSE, BENJ. D. WARFIELD for appellant.

WM. A. BYRNE for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

This is the second appeal of this case. The opinion on former appeal may be found in 143 Ky., 31, and as the facts are quite fully set out in that opinion it is not necessary that we should repeat them here except to the extent that may be necessary to illustrate the grounds relied on for reversal.

In the former opinion we said that as the right to recover was rested on the ground that the railroad company was negligent in failing to have a watchman at the place of the accident to look out for the slide and to warn Murphy in time to have enabled him to stop his train, he could not recover, as there was no evidence that the slide occurred a sufficient length of time before the accident to have enabled a watchman to give any notice. It was also said that Murphy, in disobedience of a train order, was running at a high rate of speed and this fact so contributed to the accident as to defeat a recovery. It was, therefore, held in the opinion that the trial court should have directed a verdict for the railroad company. On this appeal the railroad company insists that the evidence on the last trial is substantially the same as it was on the first trial, and so its motion for a peremptory instruction should have been sustained. It is also argued that the court erred in rejecting evidence offered by the railroad company, in admitting evidence introduced by appellant and that the verdict is excessive.

Taking up first the question whether or not the peremptory instruction should have been given, the correctness of the ruling of the trial judge on this point depends on whether or not the evidence was substantially the same as on the first trial. If it was the peremptory instruction should have been given; otherwise not. In the former opinion it was said:

"Instead then of the proven facts tending to show that the landslide took place sometime prior to the accident, they all lead to the irresistable conclusion that it occurred when appellee's engine was only a few car lengths away. That being true, no flagman or watchman could have given appellee any kind of warning in time to prevent the accident. Appellee himself received notice of the landslide as soon as any watchman could have done, and he put on the emergency brakes more quickly than he could have done had he received warning through a watchman or flagman. Indeed he

knew of the landslide as soon as it took place. It was then too late to stop the train. It follows then, that he was injured, not because of appellant's negligence in failing to have a watchman or flagman at the place of the landslide, but because of an unfortunate accident which appellant could not have prevented.''

But on this appeal counsel for Murphy insists that the evidence on the second trial showed conclusively that the landslide occurred a sufficient length of time before the train reached that point to have enabled a watchman, had one been there, to have given notice to appellee in time to have stopped his train before running into it.

Putting aside for a moment the question as to the competency of the evidence of Justice, that will be later noticed, there is quite a difference in the testimony given on this point by appellee on the first and second trial, largely due to the fact that he was examined more thoroughly on the second than on the first trial, and we think his evidence alone was sufficient to take the case to the jury upon the issue that a watchman could have averted the accident. We do not of course mean to say that the evidence of Murphy conclusively established this fact in his favor. What we do mean to say is that his evidence alone on the second trial was sufficient to take the case to the jury on this question, and it was then for the jury to say from all the evidence on this issue whether or not the accident could have been averted by the presence of a watchman.

On the second trial J. A. Justice, who was also a witness on the first trial, testified to certain facts that conduced very strongly to show that the landslide occurred several minutes before Murphy's train ran into it, and with this evidence before them the jury could not well have escaped the conclusion that the accident could have been avoided if a watchman had been stationed at the place the landslide occurred. The evidence we have referred to was not given by Justice on the first trial, and it is now earnestly argued that substantial error was committed by the trial court in overruling objections to its admission. That the evidence of Justice was of great assistance to appellee cannot be denied, and if it was incompetent the error of the court in admitting it fully warrants us in granting a new trial. For although, as we have stated, the evidence of Mur-

phy was sufficient to take the case to the jury upon the point we are now considering, it was materially strengthened by the evidence of Justice, and while the jury might have found against Murphy on his unsupported evidence, they could not have well done so when it was corroborated by the evidence of Justice. It will thus be seen that the question as to the competency of this evidence is of controlling importance, and so we will notice it carefully.

Justice was a section foreman for the railroad company in charge of that part of the track where the landslide occurred and with his crew of men was engaged at the time the accident occurred in work at a station called Livingood, three-quarters of a mile north of the place of the accident. He was asked these questions: Q. When did you first get notice, or did you get notice of the slide coming down? A. Yes, sir. Q. When did you first hear it? A. Just after No. 90 left there was a fellow by the name of Crowley; he told me. That man coming down, he told me. Q. You say a man by the name of Crowley come to Livingood? A. Yes, sir. Q. Who was he? A. A fellow in the neighborhood there. Q. Where is he now? A. He is dead. Q. At that time had Murphy's train got to the scene of the accident? A. No, sir. Q. How do you know that? A. He did not come down until after Crowley. Q. You did not hear Murphy until after this man Crowley had seen you? A. I heard him before; yes, sir. Q. Where was Murphy's train then? A. I could not tell that, but I heard it coming. Q. Had he reached the place of the accident, could you tell that? A. No, sir; he had not. Q. Where were you when you heard of the landslide? A. Livingood. Q. When you started to the place of the wreck or slide where were you? A. When I started I was at Livingood. Q. How far is Livingood from the place where the slide occurred? A. Three-quarters of a mile. Q. When you got to the place of the slide what did you see there? A. When I got there the engine was turned over the embankment and laying down next to the river. Q. When you started with your men to the slide did you know anything about the whereabouts of the plaintiff's train? A. I don't know exactly where it was. We heard it coming, but it seemed like it was half way between there and Morgan. Q. South of the slide? A. Half way between the slide and Morgan; I heard him

whistle. I could see him. Q. You knew before you left work to go to the slide what had happened? A. Yes, sir. Q. How then did you go to the slide? A. This fellow came running up to us. Q. What happened. Tell about him coming there. A. He came running up—Crowley. Q. You say Crowley came running up there? A. Yes, sir. Q. You say this man Crowley came up there and you then gathered your men together and got on a hand-car and went off? A. Yes, sir. Q. Tell what happened when he come there. A. I hollered for my men when he came there and told me about it. Q. How was this man Crowley coming? A. He was running when I saw him. Q. From what direction did Crowley come? A. He come from the South. Q. What was his appearance and what did he do? I don't want you to tell what he said. A. He come down in a run, and while he was running he said * * *. Q. What, if anything, did he do besides come running? A. He came and hollered at me.''

It will be observed that Justice was three-quarters of a mile north of the place of the accident when Crowley came running from the south and gave him the information upon which he acted. The court would not permit Justice to relate what Crowley told him but did permit him to say that he received information from Crowley, and acting on this information at once, took his crew and went to the slide, and that at the time he received this information he heard Murphy's train coming some distance south of the slide.

This evidence makes it clear that the landslide occurred sometime before Murphy's train ran into it because Justice did not get the information until at least a few minutes after the landslide occurred, and when he did get it, Murphy's train was some distance away, and except for the information received from Crowley it does not appear that Justice could have related a single fact or circumstance conducing to show how far Murphy's train was from the slide when it came down. The objection to this evidence is that it is hearsay, resting entirely upon what Crowley told Justice. The fact that the court excluded from the jury the conversation that took place between Justice and Crowley did not detract anything from its weight, as the other facts testified to by Justice fixed in the mind of the jury the vital fact in this case, that the slide occurred sometime before

Murphy's train reached the point where it came down. Although the conversation was excluded, Justice was permitted in substance and effect to tell the jury what Crowley told him, as any person of ordinary intelligence could readily supply the excluded conversation by inferring that Justice would not have acted as he did had not Crowley told him the slide had come down. When conversations are properly excluded because they are hearsay, then every material act that the witness did that had its sole origin in the hearsay statement made to him should likewise be rejected. One is equally as inadmissible as the other. If a witness could relate what he did on the faith of hearsay statements the whole of what occurred might as well be admitted, because what could be admitted under this rule would be equally as effective as if there was added to it what was excluded. Nor does the fact that Crowley may have been telling the truth affect the question of the incompetency of this evidence, as the incompetency of hearsay evidence does not depend entirely on the fact that it may be false. The reasons for rejecting hearsay evidence are put on the same grounds by all courts and text writers on the subject of evidence, and as a fair statement of the rule we take the following from Elliott on Evidence, Vol. 1, Sec. 314:

"The common expression is that hearsay evidence denotes that kind of evidence which does not derive its value solely from the credit to be given to the witness himself, but rests also in part on the veracity and competency of some other person from whom the witness may have received his information. In other words, hearsay evidence is evidence whose probative force depends, in whole or in part, upon the competency and credibility of some person other than the witness by whom it is sought to produce it. * * * The objection to hearsay, then, goes fundamentally to the point that something which should come through an original witness is sought to be put in at second-hand by one to whom it has been told; one who is not a witness properly speaking, who did not receive it, and cannot, therefore, testify to it but only to the fact that somebody said so. * * * The reasons for the inadmissibility of such evidence may be enumerated as follows: (a) the person upon whose credibility the evidence rests did not make the statement under oath; (b) there was no

opportunity of cross-examining the witness that it might appear what were his powers of perception, his opportunities for observation, his attentiveness in observing, the strength of his recollection, and his disposition to speak the truth; (c) it affords too great a latitude for deception, mistake or misapprehension, for it might have been misunderstood, or imperfectly heard, or inaccurately remembered, or perverted.''

These general statements are fully supported by Greenleaf on Evidence, volume 1, section 99; Wigmore on Evidence, volume 2, section 1361; Coleman v. Southwick, 9 Johnson, 45 (N. Y.), 6 A. D., 253, and all of the authorities we have examined. There are of course many well recognized exceptions to the hearsay rule, but this evidence does not fall within any of them. Its admission would in effect abolish the rule against the admissibility of hearsay evidence, because if the evidence of Justice, based entirely on what Crowley told him, was competent to prove when the landslide occurred and how far Murphy's train was from it when it came down, then the existence of vital and material facts in issue in any case could be shown by declarations made to a witness by a person not a witness or by the acts of the witness done on the faith of these declarations. The result would be that the presence of witnesses could be dispensed with and their statements admitted through the evidence of others who heard them, although the persons making the statements to the witness were not under oath and the party adversely affected was denied the valuable right of confronting and cross-examining the persons whose statements repeated by the witness might take from him valuable rights. Nor does the fact that Justice was an employe of the railroad company, or the fact that Crowley was dead when Justice testified, authorize the admission of the evidence. As said by Chief Justice Marshall in Queen v. Hepburn, 7 Cranch, 3 Law Ed., 348: ''If the circumstance that the eye witnesses of any fact be dead should justify the introduction of testimony to establish that fact from hearsay, no man could feel safe in any property a claim to which might be supported by proof so easily obtained.''

On the question of the contributory negligence of the appellee we said in the former opinion:

"There is another feature of the case which prevents a recovery. Appellee knew that under the bulletin orders, which he admitted having received, and which were still in force, it was his duty to reduce the speed of his train at places such as that at which the accident occurred. He admits that his schedule time was from fifteen to eighteen miles per hour. He also admits that he was running about twenty-five miles per hour. The conductor of the train places the speed at the same rate; the fireman fixes it at from twenty-two to twenty-three miles an hour. * * * Instead then of complying with the bulletin orders and reducing speed he violated these orders and actually increased his speed from eight to ten miles an hour. His statement, then, that he was proceeding cautiously with the bulletin orders in mind, cannot be given much weight when his own evidence shows that he was flagrantly violating these orders. From these facts we conclude that appellee was guilty of contributory negligence as a matter of law."

On the second trial it was satisfactorily shown by the evidence that while the average speed of this train between the terminals of Corbin and Covington was fifteen or eighteen miles an hour, that the rules of the company permitted it to be run at a speed of thirty miles an hour. So that in running his train at twenty-two or twenty-three miles an hour appellee was not violating any rule of the company unless it be that he was commanded by some rule or order to run at a slower rate of speed than this at the time and place where the accident occurred.

The accident to appellee happened on March second, and it appears that on February fourteenth a landslide had occurred at or about the place where the slide in which the appellee was injured occurred, and that while the company was engaged in removing the February landslide a rule was in force requiring trains to slow down at this point and not proceed until given orders by the person engaged in the work of removing the slide and repairing the track. But this February landslide had been entirely removed and the track fully repaired before March second, and the conductor of the train appellee was running testified that there was posted on the bulletin board at Paris on and before March second, the following bulletin: "All former orders annulled and trains can resume original speed at this portion of

the track.'' He and others testified that under the authority of this bulletin annulling the slow order there was no rule or order in force requiring the train appellee was running to slow down or stop at the place the landslide occurred, and that the train had the right to run at this place at the highest speed allowed, thirty miles an hour.

It is, however, insisted for appellant that a general order issued February fifth, directing ''all trains to run cautiously at all cuts, hillsides, and other places where there is a possibility for a slide or washout'' was in force on March second, and that it was the duty of appellee to run his train cautiously at the point where this landslide occurred, notwithstanding the fact that the former slow or stop order had been annulled. There is some dispute between the railroad men who testified as to whether or not this caution order of February fifth applied on March second to the place where the accident occurred. But to a person not engaged in the business of railroading it would appear that when the stop or slow order in force at this point had been annulled and in place of it an order issued permitting trains to resume at this place their regular speed, that it was intended that trains might be run at any speed not exceeding thirty miles an hour, and this is our construction of the bulletin. But if the general caution order applied to this place, appellee testified that he was running cautiously, had shut off steam, and was keeping a sharp lookout when the accident occurred.

Upon the whole case the only reversible error we find is in the admission of the evidence referred to, but for this error a new trial must be awarded. Wherefore, the judgment is reversed, with directions for a new trial in conformity with this opinion.

Whole court sitting.

Judge Nunn dissenting.

DISSENTING OPINION BY JUDGE NUNN.

The opinion appears to decide that the witness, Justice's testimony in whole should be excluded. To this I dissent. The two witnesses who were fishing on the creek testified that imediately before Murphy was injured, they saw a man running towards Livingood, the place where Justice was, but did not know the person.

Justice should have been allowed to testify that immediately before he started to the place where the landslide occurred, he saw a man running on the track coming from the point of landslide; that the train on which Murphy was injured was then several miles south of the place of the slide; that when he, with crew and hand-car, reached the place of landslide, it had occurred, and Murphy was injured; that the distance he, with his crew, had traveled from Livingood was three-fourths of a mile.