Samuel JONES, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Supreme Court of Kentucky.

July 29, 1977.

Jack Emory Farley, Public Defender, Gary E. Johnson, Asst. Public Defender, Frankfort, for appellant.

Robert F. Stephens, Atty. Gen., John W. Stewart, Asst. Atty. Gen., Frankfort, for appellee.

PALMORE, Justice.

Samuel Jones appeals from a judgment sentencing him to life imprisonment pursuant to a verdict finding him guilty of murder. Cf. KRS 507.020, 532.060(a).

On Monday, December 23, 1974, the body of Ted Herring was found in his home at Paducah, where he lived alone and operated a loan business. He had been trussed up and shot in the head with two .22-caliber bullets which later were determined to have been fired out of the type of pistol generally called a "Saturday-night special." From the physical evidence it appears virtually certain that more than one person participated in the crime.

Herring was last seen alive about 5:15 P.M. on Sunday, December 22, 1974, by his secretary, Joanne Moore, with whom he had attended a show that afternoon. When Mrs. Moore arrived for work on Monday morning she was unable to gain entrance to the house and eventually called the police. When she and the investigating officer got inside they found Herring dead on the floor with a pillow over his face. His safe was open and about $1,000 in cash, three pistols, a watch, several items of jewelry, and Herring's wallet were missing. All of the property stolen belonged to Herring personally. As Mrs. Moore put it, "None of the pawn stuff was taken."

Herring was a collector of old coins and currency, and among the items of cash stolen was an "oversize" $500 bill. The missing pistols consisted of two .38-caliber snubnose Smith & Wessons and a .25-caliber Colt. The critical evidence linking the appellant Jones to the crime is that on January 17, 1975, 26 days after the murder of Herring, he had one of these Smith & Wesson revolvers (which for the sake of convenience we shall call "J70") in his possession and shot one Helen Broyles with it.

Several months before his death Herring had shown Mrs. Moore a list of the serial numbers and pointed out the guns he had.

He kept J70 in a shoulder-holster hanging from a hook in his bedroom. Mrs. Moore was positive that he had not disposed of any of these weapons. She said that she saw J70 hanging at its customary place on December 22, 1974, on which day they had taken a complete inventory. When asked if she was sure J70, which was introduced at the trial, was the same gun she had seen hanging from the wall on December 22, 1974, she replied, "I am certain." It was established that Herring had purchased J70 from one Marvin Thompson, who in turn had brought it from George Noles, a dealer in guns. Thompson testified that he had seen J70 on one occasion after he had sold it to Herring, at which time "Mr. Herring had this white [wide?] trigger put on it."

The foregoing evidence was, in our opinion, amply sufficient to justify a conclusion by the jury that J70 was in fact stolen from Herring's place at the time of the murder. We now proceed to the evidence placing it in the hands of Sammy Jones on January 17, 1975.

Jones had a love affair going with a girl named Cheryl Matchem, who lived with her mother, Darlene Shackleford. He visited there "practically every day" before going to work at the Club 400, which was operated by his mother and father. He carried a pistol in his coat pocket, which he usually turned over to Mrs. Shackleford to keep until he left for work. Late Friday night or early Saturday morning of January 17–18, 1975, he came to Mrs. Shackleford's home and placed the gun in the pocket of her robe. As appears from a signed statement later given by Sammy to the police, he had just shot Helen Broyles in his apartment, and after taking the gun to Mrs. Shackleford he went to the VFW Club, had a drink, returned to the Shackleford apartment, and then went home to call the police. Early on Saturday morning Mrs. Shackleford, after receiving a telephone call from the police station, put the gun in a paper bag and took it to a neighbor's apartment. A little while afterward, however, she retrieved it and later in the day called Sammy's mother, Ruby Jones, and said she

had a package for her. Mrs. Jones then came over and got it, drove to a deserted area near Kentucky Dam, and threw the bag into the weeds without having looked to see what was in it. Some time thereafter Mrs. Jones accompanied a city detective to the scene and pointed out where she had disposed of the bag, and he recovered it. The gun found in the bag was J70.

In the second of two signed statements given to the police Sammy said, "The .38 pistol I used to shoot Helen Broyles was bought by me from a guy named Billie who came into the Club at times when he was in town, and I bought it from him before December 1, 1974. I gave him $40.00 for it. I've had it all the time since then." "Billie" was never further identified.

Beyond question, this evidence proves that on January 17, 1975, Jones had possession and was claiming ownership of J70, and if in fact it was taken from Herring's place on December 22, 1974, as the jury could reasonably have believed, it follows that Jones' statement as to when and how it came into his possession was untrue.

The only other items of evidence tending in any way to connect Jones with the crime were as follows:

(1) On November 20, 1974, he purchased a .22-caliber "Saturday-night special" at a pawn shop in Paducah.

(2) After signing the aforementioned statement pertaining to his acquisition of J70 Jones told the interrogating police officer and the Commonwealth's Attorney that he wanted to use the telephone. According to the officer's testimony, "He was asked by the Commonwealth's Attorney if he was protecting someone. He nodded his head and did not make a verbal reply. He repeated his request to use the phone, and the Commonwealth [sic] Attorney advised him that he was going to leave the room, and any further statements that he wanted to make, he could make to me . . . . I asked him who he was going to call, and he said his father. I asked him what he was going to say to his father, and he said he was going to ask him how much a $500 bill was worth. There was no further discussion."

Jones did not take the witness stand. His defense was an alibi. Mrs. Shackleford and her daughter, Cheryl Matchem, swore that he was in their apartment from Sunday afternoon, December 22, 1974, until the middle of the next morning. Cheryl said that she and Sammy had attended a dance on Saturday night and arrived at her home at about 2:30 A.M. Both she and her mother testified that Sammy stayed there the rest of that night, all of Sunday except for a short trip home during the afternoon to change clothes, and all Sunday night. Mrs. Shackleford recalled that the dance had been held at the Civic Center under the sponsorship of Tommy Massey and was a "black" dance. In rebuttal, however, the Commonwealth proved the Civic Center dance hall had been leased for the night of December 21, 1974, to the Fraternal Order of Police for a policemen's ball, and that the Massey-sponsored dance had taken place on Christmas night, December 25, 1974.

As may be observed from the foregoing summary, the evidence of guilt was somewhat short of spectacular. Yet we think it was sufficient to justify the verdict. The facts the jury was authorized to find were (1) J70 was stolen from Herring's place at the time of the murder on the night of December 22, 1974; (2) Jones had possession of J70 on January 17, 1975, claiming he had bought it prior to December 1, 1974; (3) this claim that he had acquired J70 prior to Herring's death was false, and was made in an attempt to conceal the fact that Jones had taken it on the night of the murder; and (4) Jones owned a pistol of the same type and caliber as the murder weapon. That these findings would have justified convicting Jones of stealing the gun at the time and place of the murder is an elementary proposition. Cf. *Ralya v. Commonwealth,* Ky., 495 S.W.2d 506, 507 (1973); *Jones v. Commonwealth,* Ky., 453 S.W.2d 564, 565–566 (1970). The robbery having been the obvious purpose of the murder, it follows necessarily that if the evidence was enough to identify the robber it was enough to identify the murderer.

"If under the evidence as a whole it would not be clearly unreasonable for a jury to find the defendant guilty, he is not entitled to a directed verdict of acquittal." *Trowel v. Commonwealth,* Ky., 550 S.W.2d 530, 533 (1977). Though Mrs. Shackleford and Mrs. Jones gave testimony from which the jury could have believed that Sammy probably had the J70 for some time before the Herring robbery and murder, it was not bound to believe it. The sufficiency of the evidence to justify a conviction must be tested in terms of the evidence most favorable to the Commonwealth. *Turner v. Commonwealth,* 268 Ky. 311, 104 S.W.2d 1085 (1937). Considered in that light, we hold the evidence sufficient.

The only point raised on the appeal other than the sufficiency of the evidence to convict is that the admission of Jones' signed statements was a prejudicial error.

The first statement was taken by officer Ronnie Tucker early in the morning of January 18, 1975. It related that following an argument with Helen Broyles in his apartment the previous evening Jones shot Helen and then went to the home of Darlene Shackleford, where "I told her that I had shot Helen and gave her the gun."

The second statement was taken by Detective Wallace Cunningham, in the presence of the County and Commonwealth's Attorneys, on the afternoon of January 20, 1975. It consisted only of the information we have already quoted to the effect that the ".38 pistol I used to shoot Helen with was bought by me from a guy named Billie," etc.

Following the reception of each of these statements into evidence the trial court admonished the jury as to the limited purpose for which it was to be considered. Jones does not question the form or substance of the admonitions, but contends that his objections to the evidence should have been sustained and that it was error for the trial court to deny his motions for a mistrial after the jury had heard the statements read.

The general proposition that evidence of other crimes is not admissible is somewhat akin to the rule against hearsay evidence, in that each is said to have a good many "exceptions." Fundamentally, evidence of criminal conduct not connected with the charge being tried is character evidence, which is relevant as indicating a defendant's criminal disposition and is admissible under the European continental system, but has been generally excluded under the English system for more than 300 years. Wigmore on Evidence (3d ed.), § 194. This exclusion is therefore itself an exception from the basic principle that all probative evidence relative to the issues being tried is admissible, and it does not apply when the evidence is relevant to an issue other than character.

"This eligibility of evidence for one purpose, despite its ineligibility for another, is illustrated throughout the whole law of evidence . . . . In scores of these instances the principle is illustrated and established. Our law of evidence, as a workable system, would be impossible without it.

"So far, then, as this general principle is concerned, the fact that a defendant's acts of misconduct would be inadmissible as showing his bad character does not in the slightest stand in the way of receiving the same acts in evidence if they are evidential for other purposes." Wigmore on Evidence (3d ed.) § 215.

"Is there, then, any reason why, for this particular class of facts, an exception should be made to the general canon of multiple admissibility, and facts relevant for some other purpose be rejected because they would be inadmissible if offered to show a bad character?

"In the great majority of instances in which such an exception has been sought to be established, the facts of conduct thus objected to are crimes; for obviously such conduct presents the clearest case in which the evidence is obnoxious to the character-rule, and the case in which the fact, if offered to show character, would most tellingly violate the spirit and the reasons of that rule. The question thus in effect becomes: Is the criminality of conduct a rea-

son for excluding that conduct (when offered against an accused person) if it would be otherwise relevant and admissible?

\* \* \* \* \* \*

"This much attention to the suggested exception is called for, because the effort to secure it and the inclination to ask for it seems to be so persistent and so common at the Bar; and not because its validity has ever been recognized or implied. On the contrary, no fallacy has been more frequently or more struck at by denial, by argument, by explanation, on the part of the Courts. It has been rebuffed, rebuked, repudiated, discredited, denounced, so often that it ought by this time to have been abandoned forever. That it does still crop up again from time to time is apparently due in part to the inherent difficulty of distinguishing between conduct as showing character and conduct as showing other things; but also to the failure to appreciate that the rejection of past conduct by the character-rule is never due simply to the incidental circumstance that it is misconduct, but to the fact that it is offered to show character and that herein consists its impropriety. *If there is any other material or evidential proposition, for which it is relevant, and if it is offered for that purpose, it is receivable, and its quality as misconduct or crime does not stand in the way.*" (Emphasis added.) Id., § 216.

■ We quote these passages from Wigmore mainly to emphasize the essential perspective in which the exclusionary rule against evidence of other crimes should be viewed. That evidence otherwise admissible is not made inadmissible merely because it shows an unrelated crime has been the established rule in this state from time immemorial. See, for example, *Smith v. Commonwealth*, Ky., 366 S.W.2d 902, 906 (1963), a capital case in which the owner of a liquor store was shot and killed with a .32-caliber pistol during an armed robbery. In addition to the defendant's written statement identifying a .32-caliber revolver as "the one that came out of the Meadowthorpe Liquor Store when Buddy (Martin) and I held it up" two days prior to the murder, the trial court permitted one of the owners and a clerk of the Meadowthorpe store to identify the gun as the one taken in that robbery. In disposing of the appellant's argument that the identification of the pistol as having been stolen in a previous robbery violated the rule excluding evidence of other crimes, this court pointed out that the evidence was competent for two reasons, (1) because it tended to establish the defendant's possession of the fatal weapon and (2) because it showed a plan or purpose. The rule of evidence was stated as follows:

"Appellant complains that such evidence is violative of the rule prohibiting evidence of the commission of other crimes by the accused. Of equal application to the rule insisted on by appellant is the rule that all evidence which is pertinent to the issue and tends to prove the crime charged against the accused is admissible, although it may also prove or tend to prove the commission of other crimes by him or to establish collateral facts. The fact that it may tend to prejudice the accused in the minds of the jurors is not a ground for its exclusion."

To the same effect see *Walker v. Commonwealth*, Ky., 426 S.W.2d 467, 469 (1968); *Bach v. Commonwealth*, Ky., 406 S.W.2d 727, 728 (1966); *Shepperd v. Commonwealth*, Ky., 322 S.W.2d 115, 117 (1959); and *Ringstaff v. Commonwealth*, Ky., 275 S.W.2d 946, 949 (1955).

Jones cites *Quarles v. Commonwealth*, Ky., 245 S.W.2d 947 (1952), for the proposition that even when the evidence of an independent offense "may have some tendency to prove the commission of the crime charged," it is inadmissible because its probative value is greatly outweighed by its prejudicial effect unless the independent offense has some close relationship to the crime charged. Though it may be conceded that when the evidence in question is relatively unimportant, or does not have much probative value, the policy reasons for excluding it may outweigh its value to the prosecution, we do not construe the expression of the rule in *Quarles* as meaning literally that there must be a close relationship

between the two offenses as such. As a matter of fact, that opinion went on to say that there *is* a close relationship when the other offense "tends to establish identity, motive, intent or design or a plan to commit the offense charged," and upheld the admission of testimony that the murder weapon had been stolen by the defendant from the witness because it "identified the defendant's possession of the fatal weapon and showed a plan or purpose of using it to obtain money by force." *Id.*, at 245 S.W.2d 948, 949.

In the instant case the two offenses were not related in the sense that they reflected a common plan or purpose, but they were related in that the gun used by Jones to shoot Helen Broyles played a role in both offenses and served to identify him as a participant in the Herring robbery and murder. This probative function was sufficient alone to legitimate the evidence. It was not necessary that it tend also to suggest a common design or purpose in the commission of the two otherwise unrelated offenses. In short, the two offenses need not always be "interwoven," as that term is ordinarily understood. A relevant link of significant probative value is enough.

Nevertheless, Jones contends that the evidence consisting of his statements to the police was unnecessary, because even without them Darlene Shackleford's testimony was sufficient to put the gun in his hands on the night of January 17, 1975. Actually, however, the first statement already had been introduced in evidence by officer Tucker when Mrs. Shackleford testified. Moreover, though Jones refers to her testimony as "uncontroverted," when the Commonwealth closed its case in chief it was by no means a foregone conclusion that Jones would not testify, or that Mrs. Shackleford's testimony would not in some manner be controverted or avoided through the testimony of other witnesses. With regard to the second statement, introduced by Detective Cunningham, that Jones claimed ownership and possession of the gun for some length of time, even prior to the death of Herring, constituted significant information that was not embraced in the Shackleford testimony.

■ We are of the opinion that the trial court did not err in admitting the statements, but in so holding we do not wish to encourage the unnecessary reception of such evidence. When that portion of a statement that is admissible for a legitimate purpose can be fairly extracted from that which is not admissible, only the part so extracted should be imparted to the jury. In this particular instance, however, it will be observed that in each of his statements Jones identified the gun solely by referring to it as the gun with which he had shot Helen Broyles. Hence it was difficult to extract the identification of the gun from either statement without including the explanatory reference to the shooting of Helen Broyles. Counsel for Jones could have agreed to a stipulation that the statement or statements included an acknowledgement by Jones that the gun in question was in his possession on January 17, 1975, and that he claimed having owned it since before December 1, 1974. Indeed, the transcript indicates that the trial court made a sincere effort to find a way in which the competent portions of the statements could be introduced without mention of the Broyles shooting. Under the circumstances, we think it is incumbent on counsel either to seek some reasonable accommodation, such as a stipulation, or suffer the consequence of having the bad come in with the good.

There is one other point worth notice with regard to the Broyles shooting. It has been assumed for purposes of the argument that the information revealed by Jones' statements was prejudicial, but under the unique circumstances of the case it may have helped more than it hurt, because in its absence the jurors probably would have thought that the efforts to conceal J70 resulted from its connection with the robbery and murder of Herring.

The judgment is affirmed.

All concur.