La Verne O'BRYAN, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Supreme Court of Kentucky.

March 9, 1982.

Rehearing Denied July 6, 1982.

Bart Adams, Ben B. Hardy, Sr., Paula Bierley, Louisville, for appellant.

Steven L. Beshear, Atty. Gen., Penny R. Warren, K. Gail Leeco, Asst. Attys. Gen., Frankfort, for appellee.

STEPHENS, Justice.

La Verne O'Bryan was convicted of murder and was sentenced to death pursuant to the verdict of a jury under the bifurcated trial procedure set out in KRS 532.025. On this appeal she alleges numerous errors.

### PROCEDURE

On October 5, 1979, La Verne O'Bryan was indicted by the Jefferson County Grand Jury for the murder of Harold Sadler which took place on or about December 23, 1967, and for the murder of John O'Bryan which took place on or about July 5, 1979. After the two murder indictments were severed for trial the Commonwealth in March of 1980 served notice that it would seek the death penalty in the O'Bryan case, based on alleged murder for monetary gain. KRS 532.025(2)(a)(4). On May 2, 1980, La Verne O'Bryan was indicted for the attempted murder of Le Anne O'Bryan on or about July 4, 1979. This indictment was joined for trial with the O'Bryan homicide. On July 10, 1980, appellant O'Bryan filed a motion for change of venue which was denied by the trial judge on July 14, 1980. A second motion for a change of venue was made on the opening day of the trial, July 21, 1980. The motion was denied without a hearing.

In March of 1980, several months before the trial of the O'Bryan murder and the attempted murder of Le Anne O'Bryan, the Commonwealth filed a motion to admit into evidence references and facts concerning the 1967 death of Harold Sadler. The trial court, over the vigorous objection of appellant, granted the motion. At trial, appellant objected again, and *in limine*, to any and all evidence concerning the death of Sadler. The trial court overruled the objection and admitted the evidence. The jury found the appellant guilty of the murder of John O'Bryan and of the attempted murder of Le Anne O'Bryan. In the latter case they recommended a sentence of 20 years. At the sentencing phase of the trial, the jury recommended the death penalty for the murder of John O'Bryan because La Verne O'Bryan "knowingly committed the act of murder for her own personal gain."

Appropriate motions for a new trial were overruled by the trial court and a judgment in conformity with the jury verdicts was entered. These appeals result.

### STATEMENT OF FACTS

In June of 1979, John O'Bryan, the former husband of appellant, became ill. On June 28, 1979, he was admitted to the hospital. He suffered from abdominal pain, vomiting, weakness, dizziness, kidney malfunction and deteriorating mental capacity. Following his death on July 5, 1979, an autopsy revealed death by acute arsenic poisoning. Upon receipt of this information, police interviewed Donnie and Le Anne O'Bryan, the brother and sister-in-law of the decedent. It was learned that Harold Sadler, with whom appellant had lived some years earlier, had died in December of 1967 of unknown causes. Subsequent to an interview with appellant, the body of Harold Sadler was exhumed. Based on an

autopsy and a review of Sadler's hospital records, it was established that Sadler had died of chronic arsenic poisoning. (The cause of his death was listed at the time as postinfectious polyneuritis of unknown origin.)

Le Anne O'Bryan disclosed to police that while O'Bryan was in the hospital, she told appellant that if John died, she would see to it that there would be "one hell of an investigation." For several hours after that, appellant allegedly brought Le Anne numerous cups of coffee. The next day, Le Anne became ill and vomited regularly for two days. Eleven days later a urine sample revealed the presence of arsenic.

A search of appellant's house was conducted on October 4, 1979. The only arsenic found was in a bottle of a horse medicine.

Appellant argues nine specific errors and one general error which she claims merit a reversal of her conviction. Although we have examined all allegations, we will only discuss those which we deem meritorious.

## I. DID THE TRIAL COURT COMMIT PREJUDICIAL ERROR WHEN IT ADMITTED EVIDENCE OF THE DEATH OF HAROLD SADLER AND OF HIS RELATIONSHIP WITH APPELLANT?

Although appellant was also indicted for the 1967 death of Harold Sadler, the offenses were severed, and the Commonwealth elected to try the O'Bryan homicide first. The Sadler indictment is pending, presumably awaiting the final disposition of the present case.

During the course of the trial for the murder of John O'Bryan the Commonwealth produced a substantial amount of evidence concerning the death of Sadler and his prior relationship with appellant. Evidence concerning appellant's relationship with a prior husband, David McGhee, was also introduced.

The Commonwealth's evidence showed that appellant and Harold Sadler met while both were working at P. Lorillard Corporation in the 1960's. She left her job there to go to work as a bookkeeper at Sadler's auto salvage company in Louisville. After Sadler was divorced, he and appellant lived together but held themselves out to the public as husband and wife. In August of 1967 Sadler became ill, and between that time and December 23, 1967, the date of his death, he was admitted and readmitted to three hospitals and was treated by several doctors.

It was shown by the Commonwealth that Sadler kept substances containing arsenic on his business premises. The Commonwealth also offered evidence to show that Sadler dated another woman, and that he "stalled" appellant about getting married. And, of course, the results of the autopsy of Sadler's body, conducted 12 years after his death, were introduced.

Appellant collected Sadler's life insurance and was successful in acquiring his business and seven parcels of real estate by filing a false affidavit of descent which identified herself as his widow and co-heir, with Sadler's mother.

The evidence then described appellant's relationship with John O'Bryan and his subsequent death. Shortly after Sadler's death, appellant O'Bryan began dating John O'Bryan, who was married at the time. Following John's divorce, he and appellant were married in 1970. They were divorced in 1972, but continued to live together. He operated the salvage business which appellant had "inherited" from Sadler. In July of 1974, appellant moved temporarily to Leitchfield. She and John O'Bryan signed a contract whereby he agreed to purchase certain of the inherited real estate. After a year she moved back in with O'Bryan.

From 1976 to 1979, the personal relationship between John O'Bryan and appellant continued in its intermittent way. The Commonwealth portrayed the deterioration of their relationship, with the apparent final blow occurring when John began to formulate plans to sell all the property he had purchased from her and to buy a horse farm in Brandenburg, Kentucky. It was in June of 1979, shortly after he decided to

move, that John's illness began. Appellant was portrayed throughout as a jealous person acutely conscious of money and financial security.

Since the evidence as to the O'Bryan homicide was concededly circumstantial, the evidence pertaining to the Sadler death and the circumstances leading up to it was extremely important, if not critical, to the Commonwealth's case. It may well have been as important to the guilty finding as the evidence of O'Bryan's death itself.

It is obvious that the evidence of the O'Bryan homicide was bootstrapped by the evidence concerning the Sadler death. Presumably the same would be true in the event of a trial in the Sadler case.

The Commonwealth attempted to show similarities in appellant's relationships with Sadler and O'Bryan, and suggested a factual correlation between appellant's relationship to the two decedents and their demise. It argues on appeal that the two incidents evidence a common plan or scheme on the part of appellant. It is claimed that in both instances the decedents were in the care of appellant; that in the period preceding the fatal illness, she was "constantly with both decedents"; that appellant was an insecure person who felt a need for money; that in both instances appellant's immediate financial security was threatened, and that in both cases she failed to tell anyone about the illnesses.

When one considers the admissibility of evidence concerning the Sadler death, it is essential to identify just what the evidence is, and what it is not. It *is* evidence of the death of Harold Sadler by chronic arsenic poisoning. It is not, at this point, evidence of a crime because technically speaking, there is no evidence that a crime was committed. The most that can be said is that Sadler died of arsenic poisoning. No one knows who administered the poison. Although not likely, it could have been self-administered. No one knows whether the giving (or taking) of the arsenic was done purposefully, negligently, or accidentally.

The poison could have entered Sadler's body by way of several possible sources and means.

■ Evidence of the commission of other crimes, generally speaking, is not admissible to prove that an accused is a person of criminal disposition. *Arnett v. Commonwealth*, Ky., 470 S.W.2d 834 (1971); *Pankey v. Commonwealth*, Ky., 485 S.W.2d 513 (1972). See, also, Lawson, Kentucky Evidence Law Handbook, § 2.20. The reasons for the rule are salutary. Ordinarily, such evidence does not tend to establish the commission of the crime. It tends instead to influence the jury, and the resulting prejudice often outweighs its probative value. Ultimate fairness mandates that an accused be tried only for the particular crime for which he is charged. An accused is entitled to be tried for one offense at a time, and evidence must be confined to that offense. *Pankey, supra.* The rule is based on the fundamental demands of justice and fair play.

■ However, as with all good rules, there are certain exceptions.[1] Evidence of the commission of crimes other than the one charged is admissible if, (1) it is offered to prove motive, intent, knowledge, identity, plan or scheme, or absence of mistake or accident; (2) such evidence is relevant to the issues other than proof of a general criminal disposition, and (3) the possibility of prejudice to the accused is outweighed by the probative worth and need for the evidence. *Rake v. Commonwealth*, Ky., 450 S.W.2d 527 (1970); *Lindsay v. Commonwealth*, Ky., 500 S.W.2d 786 (1973); *Hendrickson v. Commonwealth*, Ky., 486 S.W.2d 55 (1972). *Arnett v. Commonwealth, supra.*

■ The application of the exceptions to the general rule should be closely watched and strictly enforced because of the dangerous quality and prejudicial consequences of this kind of evidence. *Jones v. Commonwealth*, 303 Ky. 666, 198 S.W.2d 969 (1947). Before evidence of other crimes can be ad-

1. For an excellent, in depth discussion, see, 2 Wigmore, Evidence § 194 et seq, (Chadbourne rev. 1974), and *Jones v. Commonwealth*, Ky., 554 S.W.2d 363 (1977).

mitted to show a scheme, plan or system, the evidence must show acts, circumstances or crimes similar to, clearly connected with, and not too remote from the one charged, *Holt v. Commonwealth*, Ky., 354 S.W.2d 30 (1962).

Having thus stated the principles necessary to admit evidence of other crimes, we now address ourselves to the question of whether the evidence of Sadler's death did, indeed, establish that La Verne O'Bryan formulated a criminal system, plan, or scheme. We believe not.

There is *no evidence* of a substantial nature to indicate that La Verne O'Bryan committed such crime. The only connection is that she was living with Sadler at the time and that he died of arsenic poisoning. This is not evidence of another crime. Further, it would take a quantum leap of fact and logic to say that this evidence was of such a nature as to show a "scheme" or "system." The two events occurred twelve years apart which, in the absence of positive evidence of a system or scheme, is much too remote in time for admissibility. The prejudicial nature of this evidence cannot be denied. It included testimony that Sadler "looked like he had been poisoned", and the like. While the evidence concerning the Sadler death and the O'Bryan death might make an interesting novel or television play, the prejudice to appellant caused by the admission of such evidence cannot be allowed in a court of law. Although we do not opine as to the weight and probity of the evidence surrounding John O'Bryan's death by itself, it is obvious that the imposition of the death penalty was, in substantial part, influenced by the evidence of the Sadler death. The evidence clearly influenced the jury on the issues of both guilt and punishment.

■ Under these circumstances, we conclude that the admission of evidence of the Sadler death did not show the commission of a crime, did not point sufficiently to the appellant as the cause of the death, and failed to show a common scheme, plan or system on the part of appellant. The evidence was highly prejudicial and was improperly admitted.

■ One other related matter should be discussed here. The Commonwealth introduced evidence to show that 27 years before the O'Bryan death, appellant furtively put some "white powder" in the coffee of her then husband, David McGhee. It goes without saying that this evidence also was prejudicial and was improperly admitted. In the event of a retrial, such evidence will be excluded.

II. DID THE TRIAL COURT COMMIT ERROR WHEN IT FAILED TO HOLD A HEARING ON APPELLANT'S MOTION TO CHANGE VENUE?

On July 10, 1980, eleven days before trial, appellant filed a written motion for a change of venue. The motion was accompanied by several supportive affidavits and allegedly inflammatory newspaper articles, but there was no request for a formal hearing. No hearing was held and the motion was summarily denied in open court. No objection was made at that time about the failure of the trial court to conduct a formal hearing.

On the day of the trial appellant made a second motion for a change of venue and filed with it 60 affidavits and other newspaper articles. Notice was given and a hearing was specifically requested. No hearing was held and the motion for a change of venue was denied. No objection was made until the close of the Commonwealth's proof. Certainly, the objection, under textbook rules of this Court, was not timely made. CR 46. If this issue were the only one before us, we would not be prepared to elevate the error to the status of *Stone v. Commonwealth*, Ky., 456 S.W.2d 43 (1970), because there is no showing of manifest injustice.

■ However, since we are reversing and remanding the case, we believe that, in the event of a new trial and in the further event of a motion for a change of venue, a hearing should be held. The statute dealing with the procedure for change of venue mandates it. KRS 452.220 is as follows:

(3) Applications under this section *shall* be made and determined in open court, and the court shall hear all witnesses produced by either party and determine from the evidence whether the defendant is entitled to a change of venue.... (Emphasis added)

Until this statute is superseded by this Court, under the Court's paramount rulemaking authority, it stands as enacted by the General Assembly under the principles of comity elucidated in *Ex Parte Auditor of Public Accounts*, Ky., 609 S.W.2d 682 (1980). Under the statute's clear and unambiguous terms, a hearing in open court is required.

## III. DID THE TRIAL COURT ERR IN ADMITTING CERTAIN EVIDENCE RELATING TO THE AGGRAVATING CIRCUMSTANCES?

▉ The requisite aggravating circumstance upon which the Commonwealth relied to justify the death penalty was that appellant committed the murder for monetary gain. In September of 1974 appellant and John O'Bryan entered into a written contract whereby she agreed to sell to him five parcels of real estate which she had "inherited" from Harold Sadler. The purchase price was $30,000.00 plus an assumption of all liens and mortgages existing on the property. The $30,000.00 was payable $1,200.00 on the execution of the contract plus $100.00 per week beginning September 16, 1974 and continuing through February 1, 1975, on which date the entire remaining balance was due.

The aggravating circumstance of murder for monetary gain was supported by evidence intended to show that John O'Bryan had paid the money in full. If he failed to meet the payment schedule, appellant would not be required to transfer title. O'Bryan could, in that event, be removed from the premises and would in effect forfeit his contractual interest in the property. It is clear from the evidence that John O'Bryan did not make the payments on schedule. However, there is conflicting evidence as to certain extensions given by appellant, as to payments in cash made without receipts, and other similar occur-rences. If John O'Bryan had paid all of the money owed under the contract, he would have been entitled to a deed to the property. If he had not made all the payments, he would not have been so entitled. Since the evidence of his payment in full was, at best, conflicting, the death of John would still his voice; the proof of payment would likely fail, and appellant, under the terms of the contract, would retain both the property and whatever money he had paid to her.

The primary evidence used by the Commonwealth to prove full payment concerned a party during which John O'Bryan allegedly celebrated his final payment to appellant. The "celebration" was attended by John O'Bryan, his brother Donnie and his sister-in-law, Le Anne. Donnie and Le Anne testified that John told them that the final payment had been made. Appellant was not present at the celebration, and neither Donnie nor Le Anne witnessed any actual payment at any time. This evidence was introduced during the guilt phase of the trial and was referred to and reiterated at the sentencing phase. While there is some dispute as the timeliness of appellant's objections to this testimony, it is clear that objections were made.

The admission of this evidence provided the primary vehicle by which the Commonwealth proved aggravation. It was undoubtedly important in the guilt phase of the trial. It therefore cannot be doubted that the admission of the evidence was damaging and highly prejudicial to the appellant.

Since appellant was not present at the "celebration," the testimony of Donnie and Le Anne was clearly hearsay and, because of the prejudicial effect it had on appellant, it was improperly admitted. *Louisville & N. R. Co. v. Murphy*, 150 Ky. 76, 150 S.W. 79 (1912), *Pankey v. Commonwealth, supra,* 5 Wigmore, Evidence § 1362 (Chadbourne rev. 1974).

In conclusion we hold that prejudicial evidence concerning the death of Harold Sadler was improperly admitted, that a hear-

ing should have been granted on the motion for change of venue, and that evidence concerning John O'Bryan's final payment of the purchase price of real estate acquired from La Verne O'Bryan was inadmissible hearsay.

The judgment of the trial court is reversed and the case is remanded to the Jefferson Circuit Court for proceedings consistent with this opinion.

PALMORE, C. J., and AKER, STERNBERG and STEPHENSON, JJ., concur.

CLAYTON, J., dissents.

CLAYTON, Justice, dissenting.

In view of the overwhelming weight of the evidence of guilt, I would affirm the conviction. Under our former criminal code, virtually any error was enough to overturn a case involving the death penalty. Under our present criminal code, however, this approach pales in significance because of the aggravation (murder for profit) and mitigation factors present now.

I believe there was competent circumstantial evidence establishing that appellant committed a prior crime using the same common scheme or plan (poison), and was motivated by the same reason (profit), as in the O'Bryan death. The remoteness of Sadler's death should affect only the credibility of the evidence, and I think the peculiarity of death by arsenic poisoning makes it easier to overcome the task of proving commonality than would be true if the deaths were caused by a more typical means.