**In the Matter of M.A. and E.A., alleged Deprived Children.**

**Annette Atkins BLACK, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. 75983.**

Court of Appeals of Oklahoma, Division No. 2.

May 12, 1992.

---

David B. King, Brewer, Worten, Robinett, Johnson, Worten & King, Bartlesville, for appellant.

Craig D. Corgan, Dist. Atty., Bartlesville, for appellee.

BRIGHTMIRE, Judge.

Did reversible error permeate the jury trial culminating in a judgment on a verdict terminating the mother's parental rights to her two minor children?

We hold it did and reverse the judgment.

I

The operative facts are these. On August 20, 1984, the State of Oklahoma, acting on the recommendation of the Department of Human Services (DHS), filed a petition seeking custody of four-year-old M.A. and one-year-old E.A., the minor children of Annette Atkins Black and Timothy Atkins, based on the allegation that the children were deprived.

The parents appeared through their court-appointed counsel at an adjudicatory hearing held October 19, 1984. At that time the court found the children to be deprived, made them wards of the court, and placed them in the custody of DHS pending a dispositional hearing set for November 20, 1984. In the meantime the children were placed in a foster home. The dispositional hearing was not held, however, until November 30, 1984, at which time an order was entered placing the children in the custody of DHS and establishing some seven conditions to be met by the parents. Summarized they were: (1) earn an adequate income; (2) maintain a stable and clean home environment; (3) attend counseling sessions; (4) attend parenting skills classes; (5) receive instruction in the areas of nutrition, medical care, sanitation, and child discipline; (6) visit with the children regularly; and (7) maintain regular contact with their DHS social worker.

During the months that followed, several review hearings were held. Then in July of 1985, the mother and father separated and the mother moved to Arizona where her parents lived. The evidence is that at this point the mother began to make more progress in terms of complying with the court-ordered "conditions" or service plan. Consequently, in preparation for a review hearing to be held June 27, 1986, DHS filed a report with the court that stated, in substance, that the mother had complied with the service plan and recommended that physical custody of the children be restored to her. Accordingly, on June 27, 1986, the

trial court issued an order granting the mother physical custody of the children effective June 30, 1986, but left legal custody of the children with DHS.

The next two review hearings also produced positive reports as to the mother's progress. On September 25, 1987, this prompted the foster care review board to recommend terminating the children's dependency status and dismissing the state's petition. For this purpose a review hearing was set for December 18, 1987.

On November 17, 1987, DHS filed a report with the trial court which included a recommendation by the Arizona Department of Economic Security–Administration for Children, Youth, and Families (ADESA) that the children be permanently placed with the mother and the dependency proceeding be terminated and the case dismissed.

The trial court did not dismiss the proceedings, however, but held the matter over for further review February 2, 1988. On that date the mother's attorney was not present but the children's former foster mother was. She objected to the dismissal, requested a six month delay in the proceedings, and reported to the court that E.A. had been involved in some kind of an accident in April 1987—a minor matter as it turned out—and that the mother was pregnant with the "baby due 2/88." The judge granted the request for a further continuance out of what she called "an abundance of caution due to extraordinary developmental problems of the above named children and in consideration of the pending birth of a new sibling," and ordered DHS to "request the State of Arizona to conduct at least one more visit following the birth of the expected sibling ... to determine if the needs of [M.A. and E.A.] are still being met."

On November 22, 1988, another review hearing was held, this time on the oral motion of the state for an order that M.A. and E.A., who were then in the physical custody of ADESA, be held for return to DHS in Oklahoma, based on allegations of "extreme neglect by their mother." The motion was sustained and the requested order was issued. On April 17, 1989, the trial court issued a second service plan—consisting of eight conditions—with which the mother and her new husband were to comply.

Finally, on November 21, 1989, the state filed a motion to terminate the parental rights of both the father and mother. A two-day jury trial was commenced June 18, 1990. The jury returned a general verdict finding that the parental rights of both parents should be terminated. Judgment was entered accordingly.

The father did not challenge the termination of his rights, but the mother attacks the order as it pertains to her. She appeals.

## II

■ The first assignment of error advanced by the mother is that the verdict is not supported by any competent evidence.

The argument is that the verdict and the judgment rest on inadmissible hearsay evidence which was erroneously admitted over the mother's objection.

We agree. It should be noted at the outset that this termination proceeding is brought pursuant to the provisions of 10 O.S.1991 § 1130(A)(3) and it is clear that it is adjudicatory in nature entitling the mother to the protection of the "full panoply of constitutional rights."[1]

The sole evidence offered by the state in support of its motion to terminate was a DHS report, the testimony of a Bartlesville DHS caseworker based on the manual reporting of her understanding of telephonic conversations between herself and some ADESA people in Arizona, and a home study report allegedly produced by ADESA. All of this tendered evidence was received by the trial court over the objection of the mother.[2]

---

1. See *A.E. v. State,* 743 P.2d 1041 (Okl.1987); *Matter of Adoption of Darren Todd H.,* 615 P.2d

287 (Okl.1980); *Matter of Chad S.,* 580 P.2d 983, 985 (Okl.1978).

2. The trial court admitted the challenged evi-

The mother contends that the admission of this prejudicial hearsay evidence deprived her of a fair trial by "effectively preventing [her] from cross-examining the source of the primary evidence against her." The state's response is that the Arizona home study report was admissible as both a nonhearsay oral assertion as well as a business record ·exception to the hearsay rule. *See* 12 O.S.1981 § 2801(3); 12 O.S. 1991 § 2803(6). The state further argues that whatever error occurred as a result of the admission of the foregoing evidence "was cured by the later testimony of [former foster mother] Susan Earhart wherein she detailed the deterioration of the children while in the custody of their mother."

We agree with the mother that DHS caseworker Wallace's testimony concerning the children's home environment in Arizona while in the mother's custody was rank hearsay and the admission of such evidence deprived the mother of her fundamental constitutional and statutory rights to due process, *i.e.,* her right to cross-examine all adverse witnesses. *See* 10 O.S.1981 § 1111(C); *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). Because the mother was denied her right to cross-examine the preparer of the reports, neither they nor testimony concerning their contents should have been admitted. *Accord Watson v. Watson,* 507 P.2d 1122 (Colo.1973).

With respect to foster mother Earhart's testimony, we find nothing in it which provides a foundation for finding noncompliance with the second eight-point service plan. Ms. Earhart testified that she went to Arizona to pick up the children because the designated DHS caseworker had been injured in a car accident and was unable to go. The children met the foster mother at the airport. She recounted how M.A. leaped up on her and was excited about being able to go on the airplane. E.A. was also apparently excited about the plane ride but he ran around the airport for awhile before coming over and talking to the foster mother. And although she did opine that she thought the children had "regressed," her description of their conduct and activities did not demonstrate a failure on the part of the mother to comply with the conditions laid down by the trial court and cannot be said to have "cured" the obviously prejudicial effect of the admission of incompetent evidence.

The state in effect sought, through the mouth of the Oklahoma caseworker, to get the alleged testimony of Arizona caseworkers into evidence as a means of proving that the mother, while living in Arizona, had committed acts of commission or omission which were detrimental to her children and did not comply with the norms of conduct set forth in the amended service plan. It borders on a legal absurdity for the state to assume it could bear its heavy burden of proof in such a serious proceeding by offering a written report into evidence *only* for the limited purpose of explaining that an amended service plan had been ordered after the children's return to Oklahoma. In the first place, there was no disputed issue about the nature of the amended service plan. It was in an order located in the court file! In the second place, it is elementary that evidence of subsequent actions based solely on hearsay statements is inadmissible. *Louisville & N. Ry. v. Murphy,* 150 Ky. 176, 150 S.W. 79 (1912).

▪ Moreover, hearsay evidence admitted under § 2803(6) is largely restricted to business and commercial records which by their nature have a presumption of reliability because the recorder of the information is acting routinely under a duty of accuracy and in the regular course of business. Such exception certainly does not apply to records, business or otherwise, made specifically at the request of a court for the express purpose of providing evidence in a

---

dence on two grounds: (1) that the caseworker's testimony concerning the statements of the out-of-court declarant was not hearsay because it was not being admitted for the truth of the matter asserted but merely "to lay a foundation as to why [the witness] did what she did in the service plan" and (2) that the proffered evidence although hearsay was nevertheless admissible under the "business record exception."

pending proceeding.[3] Furthermore, entries in the form of opinions are traditionally or ordinarily not considered "business records" in the strict sense of that term. Business records are generally restricted to those of a purely factual nature.[4]

■ Finally, we address the state's argument that testimony of a member of the foster care review board was relevant evidence pertaining to what was in the best interest of the children. The trouble with this idea is that Ms. Shannon's thoughts about the matter grew out of and were based on the very same Arizona reports upon which the state had already pitched its legal tent—another forbidden attempt to bootstrap evidence past a demurrer to the state's evidence.

It is clear, then, that since the factual essentials of the state's case concerning the mother's compliance or noncompliance with the court's amended service plan consisted almost entirely of the inadmissible Arizona hearsay, there existed a fatal gap in its proof which the generalized opinions and observations of neither the foster mother nor the review board member could bridge.

### III

■ The mother's second contention is that the court improperly instructed the jury with respect to the parties' burden of proof instead of giving the two correct instructions she requested.

The mother says that while it is true that the state has the burden of establishing its allegational foundation for the termination—that the mother failed to correct the conditions leading to the deprived adjudication—by clear and convincing evidence, the mother's defenses need only be supported by a preponderance of evidence.[5] Of course, aside from the fact that the state has presented insufficient competent evidence of the mother's noncompliance with the latest service plan to prevail on its termination motion, the fact remains that the most that can be made of any shortcoming on the mother's part is that she admitted to a partial failure to comply with only two of the eight conditions because of circumstances beyond her control, namely, a lack of money. These shortcomings consisted of a failure to make weekly calls to her children the last month or so before the hearing, and a failure to visit them for a couple of weeks or so. The evidence supports her position.

■ Under these circumstances, had the state made out a prima facie case, it would have been important for the court to give the following instructions requested by the mother:

*"Requested Special Instruction No. 1:* You are instructed that whenever a parent may be properly called upon to bear the burden of showing that he or she has corrected certain conditions which led to an adjudication of a deprived child or children that he or she need not be held to the same standard as the termination

---

3. Records prepared specifically to assist in imminent litigation are generally unreliable and the "business record exception" is not meant to apply to written opinions or statements made purely for evidentiary purposes. *See Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943). *See also, Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254 (9th Cir.1984); *United States v. Baxter,* 492 F.2d 150 (9th Cir.1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974); *Otney v. United States,* 340 F.2d 696 (9th Cir.1965); *Williams v. United States,* 323 F.2d 90 (10th Cir.1963), *cert. denied,* 376 U.S. 906, 84 S.Ct. 659, 11 L.Ed.2d 605 (1964); *Trout v. Pennsylvania Ry.,* 300 F.2d 826 (3rd Cir.1962).

4. In most instances the Oklahoma Evidence Code, 12 O.S.1981 §§ 2102–3103 is identical to the Federal Rules Evid.Rules 102–1103 (1984).

*See* Committee notes, Rule 803; *United States v. Pazsint,* 703 F.2d 420 (9th Cir.1983).

5. In Instruction Nos. 2 and 8, the trial court informed the jury that the state alleged that the mother *"has failed to show* that the condition which led to the children's being deprived has been corrected" and that the law requires the jury as the trier of fact to find that the *"parent has failed to show* that the condition ... has not been corrected." The supreme court has construed the language of 10 O.S.1991 § 1130 to mean that the parent of a previously adjudicated child has an opportunity to show that he or she has corrected the conditions. This does not constitute an unconstitutional shifting of the burden of proof to the parent. *Matter of Moore,* 558 P.2d 371 (Okl.1976). *See also Matter of Christopher H.,* 580 P.2d 143 (Okl.1978) (Simms, J., specially concurring).

seeking claimant. The parent may meet his or her burden by the clear weight of the evidence rather than the clear and convincing standard.[6]

. . . .

*Requested Special Instruction No. 2:* You are instructed that if you determine that Annette Atkins Black has made sincere and extensive efforts and substantial changes concerning the conditions leading to the children's adjudication as deprived then you may elect not to terminate the parental interest of Annette Atkins Black."[7]

IV

For the foregoing reasons the judgment terminating the mother's parental rights is vacated and the cause is remanded with instructions to enter judgment denying the state's motion to terminate the mother's parental rights.

Reversed and remanded with instructions.

RAPP, P.J., and BOUDREAU, J., concur.

---

6. Where a termination of parental rights is sought on the ground of noncompliance with the previously prescribed norms of parental conduct as was clearly the case here, the parent need only show by the clear weight of the evidence that he or she has corrected the conditions which led to the finding that the child was deprived. *Matter of C.G.,* 637 P.2d 66 (Okl. 1981). It was error not to inform the jury that this burden of persuasion is different than that required of the state, properly articulated in Instruction No. 13.

7. While the authority relied upon by the mother, *Matter of J.L.,* 578 P.2d 349 (Okl.1978), for this requested instruction does not expressly stand for the proposition that the trier of fact *must* determine whether a parent has made "sincere and extensive efforts" to change the conditions leading to the child's adjudication as deprived, it follows that such a subjective analysis is contemplated by § 1130 especially in light of the balancing of the respective interest of the child, the parents and the state in termination of parental rights proceedings. *See In re T.H.L.,* 636 P.2d 330 (Okl.1981).