Louis William ADCOCK, Jr., Appellant,

v.

COMMONWEALTH of
Kentucky, Appellee.

Supreme Court of Kentucky.

Jan. 16, 1986.

Daniel T. Goyette, Frank W. Heft, Jr., Jefferson Dist. Public Defender's Office, Louisville, for appellant.

David L. Armstrong, Atty. Gen., Gerald Henry, Asst. Atty. Gen., Frankfort, for appellee.

OPINION OF THE COURT.

Appellant was convicted of murder, rape, and burglary and was sentenced to life imprisonment for murder, life imprisonment for rape, and 20 years for burglary. No question is raised concerning the sufficiency of the evidence to support the verdict.

Appellant raises ten issues for review on this appeal. Some of the issues raised require consideration of the facts.

The victim, Marie Relkin, was an eighty-year-old woman who was raped and severely beaten during the course of a burglary. She was hospitalized and died in the hospital 29 days later from a heart attack. The jury was entitled to believe from the evidence that the heart attack was attributable to the beating which the victim received and/or that the beating hastened her death.

For reasons indicated below we reverse the judgment.

Terry Mann testified that he saw the appellant run from the victim's home on the night of the attack. He described the clothing appellant was wearing and identified him in court. He was the only witness who purportedly saw the appellant run from the victim's home.

Appellant sought to show on cross-examination that Terry Mann, at the time he testified, was on parole under active supervision. He contended this evidence was admissible to show a possible bias on the part of Terry Mann in that Mann may have been motivated to give his testimony to stay within the good graces of law enforcement officials.

The trial court had previously ruled that appellant could not impeach Mann by proving a prior conviction of arson because arson was not a *"Cotton* -type" felony.

The court concluded that evidence concerning parole status would necessarily inform the jury of the fact that Mann had been convicted of a felony, and thus, would accomplish indirectly what could not be accomplished directly. The appellant was precluded from asking about parole.

 Neither party cites us to a case in point. It is clear, however, that a defendant has a right to put in evidence any fact which might show bias on the part of a witness who has testified against him. This would include the fact that the witness is under indictment, *Spears v. Commonwealth,* Ky.App., 558 S.W.2d 641 (1977); *Chesapeake & Ohio Railroad Co. v. Pittman,* 283 Ky. 63, 138 S.W.2d 962 (1940), or that the witness was on probation. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The denial of the right to show such potential bias was characterized by the United States Supreme Court as a constitutional error of such magnitude which could not be cured by a showing of no prejudice. *Davis, supra.*

 The fact that the veracity of a witness may not be impeached by proof of prior convictions not involving dishonesty is not a sufficient reason to deny a defendant the right to show potential bias of a witness which a juror might infer from the fact that the witness was on parole under active supervision.

The Commonwealth also contends that the settled law in Kentucky precludes mention of parole before a jury in a criminal case. The cases thus holding, however, only preclude a jury from considering the possibility of parole of a defendant if he is convicted and have no applicability to a witness.

 A witness, Mark Riggs, was permitted to testify concerning a conversation with appellant in which appellant said he was in trouble.

"Q 69 Did you continue to ask him questions about it?

"A I told him I seen on TV that this old woman got her house broke into in the eastend.

"Q 70 Did you ask him any questions about that?

"A Yes sir.

"Q 71 And do you recall specifically what you asked him, sir?

"A I told him that I seen it on TV, like I just said, about the old woman and I told him that she got beat, or she got robbed, and I asked him, you know, if that was it.

"Q 72 And you asked him—what do you mean by you asking him if that was it?

"A I seen it on TV and it was supposed to be in the same part of town. So I just asked him about it.

"Q 73 And what, if anything, did he say to you?

"A He said, 'That's it.'

"Q 74 He said, 'That's it,' meaning what to you?

 "MRS. HASELDEN: Objection.

 "THE COURT: Overruled, he may answer.

"Q 75 What is that, sir?

"A What we were talking about

"Q 76 And what were you talking about?

"A What I had just seen on TV, about the old woman that got beat up and robbed.

"Q 77 Did you mention any other detail to him about it?

"A I asked him if she had a cat because I remember seeing that on TV.

"Q 78 And when you asked him if she had a cat, what if anything did he say then?

"A He just nodded his head and said, 'That's it.'

"Q 79 He nodded his head saying, 'That's it' meaning what to you?

"A Meaning that was the one that I was talking about."

Over appellant's objection, Riggs was permitted to testify that he thought appellant meant that the trouble appellant was in was the robbery of Mrs. Relkin which had been reported on television.

Appellant's objection should have been sustained. It was permissible for the witness to relate what appellant told him, but it was not permissible to allow him to express his view as to what appellant meant by what he said. *DeVerell v. Commonwealth*, Ky., 539 S.W.2d 301 (1976). It was the prerogative of the jury to make its own independent determination of what appellant meant by his statement, and Riggs' expression of opinion invaded the province of the jury.

Because there will likely be a retrial of this case, it is necessary to discuss some other allegations of error which may arise again in the new trial.

In separate counts of the indictment, appellant was charged with various crimes which were committed when appellant broke into the home of Marie Relkin on October 11, 1982, and again on April 19, 1983. Severance was granted, and appellant was tried on the charges relating to April 19, 1983. Appellant's motion to exclude evidence relating to the October 11, 1982, events was overruled.

As a consequence, the Commonwealth, in this trial of appellant for the burglary, robbery, and murder of Mrs. Relkin, was permitted to introduce evidence that appellant, six months prior thereto, had also broken into Mrs. Relkin's home and had robbed and beaten her.

A rule of long standing in Kentucky prohibits introduction in criminal cases of evidence of the commission of crimes, other than the crime charged, subject to the exception that such evidence is competent to establish identity, guilty knowledge, intent or motive, pattern or scheme, or when other offenses are so interwoven with the one under trial that they cannot be properly separated. *Arnett v. Commonwealth*, Ky., 470 S.W.2d 834 (1971).

Appellant relies especially upon *O'Bryan v. Commonwealth*, Ky., 634 S.W.2d 153 (1982), and *Pankey v. Commonwealth*, Ky., 485 S.W.2d 513 (1972).

*O'Bryan* and *Pankey* each turned on the fact that although the defendants were charged with other crimes which conceivably might have involved a similar pattern or scheme as the one employed in the crime for which they were being tried, there was no proof that they had committed the other crimes. They had simply been indicted for other similar crimes.

It is true that appellant was only indicted for, but not convicted of the October 11, 1982 crimes against Mrs. Relkin. The evidence introduced against him, however, was not that he had been charged with the other offenses but that he had admitted his guilt as to them.

■ In every case in which evidence of other crimes is sought to be introduced to establish a pattern or scheme, the real question is whether the method of the commission of the other crime or crimes is so similar and so unique as to indicate a reasonable probability that the crimes were committed by the same person. If it does so, evidence that the defendant committed the other crime is admissible. If it only tends to show a tendency or disposition to commit a crime, the evidence is not admissible.

■ In this case, the evidence is not only that appellant committed a similar crime within the previous six months, but that he committed it in the same household and against the same person, that in each case he broke into a residence, severely assaulted and beat the occupant and robbed her. We think the circumstances were so similar and were near enough in time as to constitute a signature of sorts of the appellant, and the evidence was therefore admissible.

■ Appellant contends he was entitled to an instruction on reckless homicide because a jury could reasonably believe that he was unaware of a risk that Mrs. Relkin might die as a result of the beating administered by him.

K.R.S. 501.020(4) provides:

" 'Recklessly'—A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

No reasonable person could fail to perceive that a severe beating of an eighty-year-old woman such as was administered here posed a substantial and totally unjustifiable risk that death would result.

The appellant did not testify that he was unaware of the risk. We do not find any circumstance which would permit a jury to find that he did not know that there was a substantial risk that Mrs. Relkin might die as a result of his actions. The fact that she actually survived for 29 days in the hospital does not lessen the fact that the beating posed a substantial risk of which appellant could not help but be aware of.

■ It was not error to refuse the instruction on reckless homicide. The jury was instructed that it might find appellant guilty of murder if it believed appellant beat and injured Marie Relkin and that her death was either caused or hastened by reason of the injury. The instruction was taken from Palmore, *Kentucky Instructions to Juries*, § 2107. Appellant objected to the instruction,

"in that it confuses the situation rather than clarifies it. It appears to be taking away from the jury their determination of what the actual cause of death was. It appears to muddy the water rather than clarify it in any way whatsoever. We would object to it on that basis."

On appeal, appellant contends the instructions on *hastening* do not require the jury to find that the beating was the direct cause of death but permit a verdict of guilt based on a finding that the beating hastened the death, an indirect cause.

Although it is indeed questionable if the argument advanced in this court was preserved for review by the "muddy water" objection to the instructions, we will, be-

cause of the likelihood of a new trial, dispose of the issue on the merits.

There was medical testimony from which a jury was entitled to believe that the beating caused the death of Mrs. Relkin. Although she was old, had suffered a previous heart attack and had serious coronary artery disease, the evidence would amply support a finding that the beating hastened her death in that she would not have died when she did except for the precipitating factor of the beating.

Even though a person suffers from serious maladies from which he will die sooner or later, to the extent that the infliction of an injury hastens death and causes it to occur sooner rather than later, the injury is a direct cause of the death at the time it occurred. *Hubbard v. Commonwealth*, 304 Ky. 818, 202 S.W.2d 634 (1947); *Hopkins v. Commonwealth*, 117 Ky. 941, 80 S.W. 156 (1904).

In *Hopkins* we said:

"Cole, at the time he was shot, was in a very feeble condition of health, being in what is known as the second stage of consumption, and would probably not have lived very long even if he had not been wounded. The injury inflicted by the shooting was not necessarily fatal, and, but for the enfeebled condition of the deceased's health, he would, more than probably, have recovered. The evidence of the physicians show that his death was accelerated or hastened by the wound received at the hands of appellant. Appellant's testimony is to the effect that he fired in self-defense, but the evidence of the commonwealth tends to show that the shooting of Cole was an act of wanton assassination. The verdict of the jury was not contrary to the evidence.

"The trial court did not err in the instruction complained of. Although the wound which appellant inflicted upon the deceased would not probably have caused his death had he been a well man, he is not, therefore, guiltless of the crime with which he stands charged. If one unlawfully wounds another, and thereby hastens or accelerates his death by reason of some disease with which he is afflicted, the wrongdoer is guilty of the crime thereby resulting. The rule upon this subject is thus stated by Bishop in his work on Criminal Law, volume 2, § 638, subsec. 3: 'Though the person would have died from some other cause already operating, it is enough that the wound hastened the termination of life; as, for example, if he had already been mortally wounded by another. And if the one attacked was enfeebled by disease, and what was done would not have been mortal to a well person, still, whether the assaulting person knew his condition or not, after he did what was mortal to the other, the offense is committed.' Clark, in his Criminal Law (page 129), says: 'The fact that the person killed was diseased and in ill health, or wounded by another, and was likely or sure to die when the blow was given, or that after the blow was given he neglected or refused to take proper care of himself, or submit to an operation by which he could have been cured, is no defense.' Hale, in his Pleas of the Crown (volume 1, p. 428), says: 'If a man be sick of some such disease which possibly, by course of nature, would end his life in half a year, and another gives him a wound or hurt which hastens his end by irritating and provoking the disease to operate more violently or speedily, this hastening of his death sooner than it would have been is homicide or murder, as the case happens, in him that gives the wound or hurt, for he doth not die simply by the visitation of God, but the hurt that he receives hastens it, and an offender of such a nature shall not apportion his own wrong. . . .' "

*Id.*, 80 S.W. at 156–157.

Both *Hubbard* and *Hopkins* were rendered before the adoption of the penal code, but the fact remains that the hastening of a death which would not otherwise have occurred at that time is a cause of the death. We see no error in the instruction.

The appellant sought to impeach the credibility of the witness Terry Mann by showing that his reputation for truthfulness was bad. Robert Pointer, when questioned concerning the reputation of Terry Mann, was asked:

"Do you know his reputation in the community for truthfulness?"

Objection was made as follows:

"Your honor, the Commonwealth is going to object to her bringing in testimony with reference to that man's character."

In proceedings outside the hearing of the jury, it developed that the witness did not know Mann's neighbors and associates in the community in which he lived. He did, however, state that he knew other family members who knew Mann and who spoke about him. The trial court ruled that knowledge of Mann's reputation among family members was not sufficient to qualify the witness to testify as to reputation.

One's general reputation is not what another person may know or think about him, but it is the estimate in which he is held by the people generally with whom he associates and comes in contact in everyday life. *Citizens Bank of Morehead v. Hunt,* 287 Ky. 646, 154 S.W.2d 730 (1941).

Before testimony as to bad reputation can be introduced, it is necessary to show that the witness knows what that reputation is among people generally with whom he associates and comes in contact in everyday life. The thrust of the inquiry is as to general reputation of the person in the community among people who know him, and not to his reputation among a small segment of the community.

Family members, of course, are among the people who have knowledge of one's reputation, and we see no reason why statements made by family members should be excluded as a source of knowledge of one's general reputation. Nevertheless, a witness cannot testify as to general reputation based solely upon what family members have stated to him or in

his presence. General reputation in the community may be entirely different from the regard in which he is held by family members. It is only general reputation about which testimony can be received.

Because there was no showing that Robert Pointer knew the general reputation of Terry Mann for truthfulness and veracity in the community among those with whom he associated and came into contact in everyday life, the trial court properly sustained the objection to his testimony.

The remaining allegations of error are either not likely to occur upon retrial or are not of sufficient merit to warrant any further extension of this opinion.

The judgment is reversed for further proceedings consistent with this opinion.

STEPHENS, C.J., and GANT and VANCE, JJ., concur.

LEIBSON, J., concurs by separate opinion.

WINTERSHEIMER, J., dissents by separate opinion in which AKER and STEPHENSON, JJ., join.

LEIBSON, Justice, concurring.

I concur in the results, but disagree with the majority opinion in two respects.

First, I agree with the appellant that the murder instruction did not sufficiently define what was necessary before conviction based on hastening the victim's death. To find the appellant guilty of murder for having inflicted wounds or injury which "hastened" the victim's death, the instructions should explicitly require "a causal connection between the wounds or injury inflicted by the defendant and the victim's death but for which death would not have occurred at the time when it did."

The instructions as given are not sufficiently clear on the fact that the appellant's acts must contribute *directly* to the cause of death. Here there was reliable medical

evidence indicating that the beating inflict-ed by the appellant was not a substantial contributing factor in hastening the vic-tim's death. In such circumstances it is incumbent on the court to make this re-quirement clear to the jury.

Next, I disagree with the decision of the majority regarding impeachment evidence against the witness, Terry Mann. The evi-dence offered to show that his reputation for truth and veracity was bad should have been admitted. A common sense meaning of the term "general reputation in the com-munity" (Lawson, *Kentucky Evidence Handbook*, 2d ed. Sec. 415), includes fami-ly.

The witness in this case was Terry Mann's first cousin. He had known him since he was a baby. The witness' opinion was not based on statements by one family member, but Mann's general reputation within his own family. That should be enough to qualify such evidence.

WINTERSHEIMER, Justice, dissenting.

I must respectfully dissent because I be-lieve the claimed errors do not require a reversal and because the ultimate result upon any retrial will be the same.

No question is raised about the sufficien-cy of the evidence to support the jury ver-dict of conviction. Adcock presents ten rather technical legal arguments related to the conduct of the trial. My review of the record indicates that the alleged errors are marginal, judgmental trial situations which should not be magnified into reversible er-ror on appeal. In my view the trial was fundamentally fair.

The result in this case will not be any different upon an ultimate retrial. Consid-ering the entire case there is no substantial possibility that the result would be any different and the alleged errors are non-prejudicial. RCr 9.24; *Abernathy v. Com-monwealth*, Ky., 439 S.W.2d 949 (1969).

Therefore, reversal serves no useful pur-pose.

The crucial argument on which the ma-jority opinion is based is the right of the defendant to cross-examine a prosecution witness about the parole status in order to demonstrate bias or prejudice. In my view the trial judge properly excluded all evi-dence of parole status. Adcock concedes that ordinarily probation or parole status is not to be mentioned during trial. *See Payne v. Commonwealth*, Ky., 623 S.W.2d 867 (1981).

Here, the witness who was a new neigh-bor of the victim, identified Adcock as run-ning out of the victim's house. Adcock argues that the witness may have had an interest in pleasing the police because he was on active parole supervision.

The prior felony of the witness was not an offense subject to comment under *Cot-ton v. Commonwealth*, Ky., 454 S.W.2d 698 (1970). The trial judge ruled that Ad-cock could not question the witness about his criminal record but could ask why he gave information to the police. The prose-cution witness testified that he did not try to help the police, he just wanted to help himself and his family because they lived across the alley from where it happened and his home had been previously burglar-ized. Consequently, it would appear that Adcock was free to inquire as to any other motive for possible bias by the witness in testifying.

An examination of the record indicates that a later witness who was also a neigh-bor of the victim testified that the witness in question did not want to talk to the police at all because he did not want to get involved. In my opinion the record indi-cates that the witness was not trying to obtain any favorable treatment from police but did not want to get involved in any respect. I do not believe there is any rea-sonable basis under the facts of this case to permit inquiry into parole status.

Use of the federal case of *Davis v. Alas-ka*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), is inappropriate for witnesses on parole in Kentucky. *Davis v. Alaska, supra*, is related to the possibility of favor-

able treatment and the reasonable expectation by the witness of obtaining favorable treatment from police and prosecutors.

In Kentucky, parole and probation are totally distinct concepts. Probation may be granted by the judicial system whereas parole is a function of the administrative branch of government. A probationer remains subject to the trial court and adverse comment by the local prosecutor, but the parolee is under the jurisdiction of the State parole board insulated from local pressure. In *Davis v. Alaska,* the chief prosecution witness was on probation; this witness was on parole.

I do not believe this Court should be in the position of a precursor of United States Supreme Court in expanding the rights of criminal defendants. If anything, our obligation is to follow the direction of the highest federal court and not to provide new means for erosion of existing Kentucky legal principles and procedures.

It is interesting to note in the concurring opinion in *Davis v. Alaska,* Mr. Justice Potter Stewart finds that the right to cross-examine a particular prosecution witness about his status as a probationer is only a qualified right and is not conferred in every case to impeach the general credibility of a witness.

I would affirm the conviction in all respects.

AKER and STEPHENSON, JJ., join in this dissent.