COMMONWEALTH of Kentucky, Appellant,

v.

Marcus BUFORD, Appellee.

No. 2004–SC–000177–DG.

Supreme Court of Kentucky.

April 20, 2006.

Rehearing Denied Aug. 24, 2006.

Gregory D. Stumbo, Attorney General, David A. Smith, Assistant Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellant.

Tod D. Megibow, Megibow & Edwards, Paducah, Counsel for Appellee.

ROACH, Justice.

The Commonwealth appeals a decision of the Court of Appeals which reversed the conviction of Appellee, Marcus Buford, for two counts of First–Degree Sexual Abuse. In its opinion, the Court of Appeals cited two primary rationales for reversing Appellee's conviction: (1) that the admission of testimony about an exchange between Appellee and Greg Waldrop, a friend and fellow minister, was prohibited by the Fifth Amendment; and (2) that the testimony of Appellee's niece, S.B., relating to allegations of sexual abuse she had made several years earlier was improperly admitted under KRE 403 and KRE 404(b). We granted discretionary review and now affirm the Court of Appeals, though for slightly different reasons.

## I. Background

Appellee was tried in the McCracken Circuit Court, where he was convicted of two counts of First–Degree Sexual Abuse and sentenced to two five-year prison terms to be served consecutively. Appellee's conviction arose from charges that he had molested two girls, J.R. and H.S. The girls were members of the youth group at Concord United Methodist, where Appellant served as a youth minister and was in charge of the youth group.

The first alleged incident occurred on October 17, 1999 at Appellee's home and involved J.R., who was 15 years old at the time. Members of the youth group had gathered at Appellee's home for a sleepover—the group was leaving the next day on a youth trip. That night, several members of the group were in Appellee's living room watching a movie. J.R. testified that she was lying next to Appellee during the movie, and that he touched under her shirt

and underwear for several minutes. J.R. also testified that she tried, but was unable, to remove Appellee's hand from under her clothing. Ultimately, she excused herself to the bathroom, but Appellee continued to touch her after she returned to the living room. J.R. testified that she was finally able to stop the behavior by exclaiming, loudly enough for others in the group to hear, that she had something in her ear. Later that same night, J.R. testified that she awoke to find Appellee straddling her back and caressing her inappropriately.

J.R. confided what had happened to S.L., another member of the youth group at the sleepover, and the two girls confronted Appellee about the incident. According to the girls, Appellee told them that his behavior had been a mistake and that he had confused J.R. with his wife. The girls also testified that Appellee acknowledged what he had done was wrong and promised to get counseling, but begged them not to tell anyone about the incident because it would ruin his life.

The second incident occurred on August 25, 2000, and involved H.S., who was also in the youth group and was the daughter of Concord's senior pastor. H.S. was 12 years old at the time. H.S. participated in a Friday-night "lock-in" activity at the church with other members of the youth group. As part of the event, youth group members stayed in the church overnight, participated in meetings, played basketball, and watched movies. At some point in the night, several of the children attending the event gathered in a church classroom to watch a videotape. Appellee invited H.S. to lie next to him during the movie. H.S. testified that while she was lying next to Appellee, he kissed her and repeatedly touched her under her clothes, including beneath her underwear. H.S. also testified that she tried to stop Appel-

lee from touching her under her clothes, but she was unable to do so.

H.S. did not tell anyone about the incident during the lock-in. The day after the lock-in, she told her friend S.S. what Appellee had done to her. H.S. made clear that she did not want S.S. to tell anyone about the incident because she feared that Appellee would get in trouble. On the Monday following the lock-in, H.S. also contacted J.R., who she knew was close to Appellee, and asked J.R. if Appellee had ever touched her inappropriately. J.R. did not answer right away, but later that evening called H.S. back and related the story of her earlier abuse. The two girls spoke on the phone several times throughout the next week. During that same period, H.S.'s parents noticed that she was more withdrawn than usual and that she was speaking regularly with J.R., an older girl who had not previously been a close friend. H.S.'s mother confronted her about the change in her behavior approximately one week after the lock-in. At that point, H.S. told her mother that Appellee had sexually abused her. H.S.'s mother and father both attempted to contact Appellee, who they had both held in high esteem prior to their daughter's revelations, but he would not return their phone calls.

After the allegations were brought to light, Greg Waldrop, a friend of Appellee and a minister at another church, confronted Appellee about the serious charges that had been made by H.S. and J.R. Waldrop testified regarding the circumstances of this meeting before the grand jury and as a prosecution witness during the trial. Essentially, Waldrop testified that after speaking with a local church official and obtaining permission from Appellee's wife, he attempted to speak with Appellee in an effort to get Appellee's side of the story about the girls' claims. However, Appellee refused to speak with Waldrop and

retreated from his presence. The Commonwealth presented this evidence, over Appellee's objection, as an adoptive admission of guilt. In his matter-of-right appeal, Appellee argued that any exchange between himself and Waldrop was privileged as a "confidential communication between the person and a clergyman in his professional character as spiritual advisor." KRE 505. The Court of Appeals rejected Appellee's claim of religious privilege, but nevertheless reversed, opining that the admission of the evidence violated Appellee's Fifth Amendment privilege against self-incrimination.

In addition to evidence relating to the alleged abuse of J.R. and H.S., there was also a substantial amount of testimony at trial relating to an earlier allegation of abuse against Appellee by his niece S.B. In 1998, S.B. had alleged that Appellee touched her inappropriately during a camping trip to the Land Between the Lakes recreational area in Trigg County. S.B. was eight years old at the time of the incident. Although S.B.'s allegations were investigated and presented to a Trigg County Grand Jury, Appellee was not indicted. As noted by the Court of Appeals, there were significant questions as to the reliability of S.B.'s statements, not the least of which was the fact that the girl's allegations came to light during a bitter custody dispute between S.B.'s mother and her father, Appellee's brother. In addition, the Court of Appeals stated that, "S.B. testified that she could not remember the events surrounding her alleged sexual abuse by [Appellee]. She theorized that the event may have only been a dream or that she may have been told what to say by someone else." Ultimately the Court of Appeals concluded that evidence of S.B.'s alleged abuse was more prejudicial than probative and should have been excluded by the trial court under KRE 403. Alternatively, the Court of Appeals reasoned that evidence of the alleged "prior bad act" by Appellee was inadmissible under KRE 404(b).

We subsequently granted discretionary review.

## II. Analysis

### A. Prior Bad Acts Evidence

■ The Commonwealth challenges the Court of Appeals' conclusion that evidence of another allegedly similar incident of sexual abuse by Appellee against his niece, S.B., was error. The Commonwealth argues that this evidence, which included the testimony of S.B. and several other individuals, was properly admitted and that the jury was free to consider it in assessing Appellee's guilt. Appellee contends that admission of the evidence was error, and is sufficient to justify a reversal of his conviction. We agree with Appellee and affirm the decision of the Court of Appeals.

The Court of Appeals held that the trial court abused its discretion in failing to exclude evidence of Appellee's alleged prior bad acts pursuant to its gatekeeping function under KRE 403. Citing *Barnett v. Commonwealth*, 979 S.W.2d 98 (Ky. 1998), the court recounted three factors that must be considered by the trial court in evaluating the admissibility of evidence under KRE 403: "the probative worth of the evidence, the probability that the evidence will cause undue prejudice, and whether the harmful effects substantially outweigh the probative worth." *Id.* at 103. As to the first factor, the Court of Appeals stated that "[t]he probative value of the testimony is, at best, questionable," and noted several deficiencies in the evidence that was presented. The Court of Appeals also held that the evidence was unfairly prejudicial because it "unnecessarily and unreasonably [led] the jury to the conclu-

sion that [Appellee's] actions against H.S. and J.R. were 'in conformity' with his actions against S.B." The opinion concluded that the relative lack of probativeness, coupled with the high likelihood of unfair prejudice should have compelled the trial court to exclude evidence concerning S.B.'s allegations.

While we find no fault with the Court of Appeals' description of the trial court's responsibility under KRE 403, we disagree that the trial court's failure to undertake this analysis was the primary flaw in its reasoning. Instead, we affirm the Court of Appeals' alternate holding that the trial court failed to correctly decide the preliminary issue of admissibility, namely, whether evidence of S.B.'s allegations qualified as an exception to our rule against the admissibility of prior bad acts.

KRE 404(b) provides the general rule, as well as a non-exhaustive list of exceptions:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
> > (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Here, the Commonwealth sought to introduce evidence of S.B.'s earlier allegations as proof of Appellee's modus operandi, arguing that the evidence was admissible for one or more of the "other purposes" outlined in KRE 404(b)(1). Specifically, the Commonwealth argued, and the trial court agreed, that "the alleged prior bad act [had] sufficient similarity to the present allegations, to be admissible to show proof of motive, intent, plan, and/or absence of mistake or accident."

In prior decisions we have cautioned that because of the highly-prejudicial nature of evidence of a defendant's prior bad acts,

> KRE 404(b) has always been interpreted as *exclusionary* in nature. It is a well-known fundamental rule that evidence that a defendant on trial had committed other offenses is never admissible unless it comes within certain exceptions, which are well-defined in the rule itself. For this reason, trial courts must apply the rule cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime.

*Bell v. Commonwealth,* 875 S.W.2d 882, 889 (Ky.1994) (internal citation and quotation marks omitted) Furthermore, we have noted:

> In order to prove the elements of a subsequent offense by evidence of modus operandi, the facts surrounding the prior misconduct must be so strikingly similar to the charged offense as to create a reasonable probability that (1) the acts were committed by the same person, and/or (2) the acts were accompanied by the same *mens rea.* If not, then the evidence of prior misconduct proves only a criminal disposition and is inadmissible.

*Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999) (citing *Billings v. Commonwealth,* 843 S.W.2d 890, 891 (Ky.1992); *Adcock v. Commonwealth,* 702 S.W.2d 440 (Ky.1986)). Stated another way,

> it is not the commonality of the crimes but the commonality of the facts constituting the crimes that demonstrates a modus operandi. Although it is not required that the facts be identical in all respects, "evidence of other acts of sexual deviance . . . must be so similar to the crime on trial as to constitute a so-called signature crime."

*Dickerson v. Commonwealth,* 174 S.W.3d 451, 469 (Ky.2005) (quoting *Rearick v. Commonwealth,* 858 S.W.2d 185, 187 (Ky. 1993)).

The Commonwealth argues that the Court of Appeals erred by applying a more demanding standard of review than was appropriate since the evidence proving modus operandi in this case was offered for one of the KRE 404(b) exceptions other than as proof of Appellee's identity. But this argument ignores our recent cases on this subject which generally recognize no such distinction. We have held that even when prior bad acts evidence that establishes modus operandi is offered for a purpose other than to prove identity, "the real question is whether the method of the commission of the other crime or crimes is so similar and so unique as to indicate a reasonable probability that the crimes were committed by the same person." *Dickerson,* 174 S.W.3d at 468–69 (quoting *Adcock v. Commonwealth,* 702 S.W.2d 440, 443 (Ky.1986)).

Turning to the facts in this case, the Court of Appeals noted several dissimilarities between the circumstances of S.B.'s alleged assault and those of J.R. and H.S. The Court of Appeals noted, among other things, that J.R. and H.S. were significantly older than S.B. was at the time of the claimed assaults; that S.B. was a family member, where the other girls were not related to Appellee; and that the alleged incidents occurred in very different settings—a private family camping trip versus youth group functions with many participants. Not surprisingly, the Commonwealth draws different inferences from these facts, noting that regardless of any family relationship, Appellee had been entrusted with the care of each girl; that regardless of their specific ages, each of the girls was a female under the age of consent; and that regardless of the partic-

ular setting in which each incident of abuse occurred, it always happened under the cover of darkness when others that might have objected were either asleep or inattentive.

We recount these arguments to demonstrate that given two factual scenarios, clever attorneys on each side can invariably muster long lists of facts and inferences supporting both similarities and differences between the prior bad acts and the present allegations. It is inevitable, particularly when the prior act amounts to an earlier violation of the charged offense, that there will be some basic similarities between the prior bad act and the new criminal conduct. Again, as we have previously noted,

> it is not the commonality of the crimes but the commonality of the facts constituting the crimes that demonstrates a modus operandi. Although it is not required that the facts be identical in all respects, "evidence of other acts of sexual deviance ... must be so similar to the crime on trial as to constitute a so-called signature crime."

*Dickerson,* 174 S.W.3d at 469. Ultimately, the Commonwealth must demonstrate that there is a factual commonality between the prior bad act and the charged conduct that is simultaneously similar and so peculiar or distinct that there is a reasonable probability that the two crimes were committed by the same individual. Notwithstanding the competing lists of facts and inferences offered by either party, there is nothing in the record of this case which demonstrates the requisite striking similarity between the incident involving S.B. and that involving J.R. or H.S.

■ Finally, we must consider whether the trial court's error was harmless pursuant to RCr 9.24. The Commonwealth presented several witnesses who testified regarding S.B.'s allegations and the evidence

was used as a crucial part of the Commonwealth's theory of the case. This led Appellee to present several witnesses who testified extensively on the subject, presumably because of the perceived damage of the evidence regarding S.B.'s allegations. Among these witnesses were S.B.'s mother, Tonya Buford Weddington; Appellee's mother, Geraldine Buford; and Appellee's wife, Collette Buford. Appellee also testified about the earlier allegations and his relationship with S.B. In all, more than one third of the witnesses in the case offered testimony regarding S.B.'s allegations.

Perhaps most damaging, however, were the Commonwealth's references to the incident regarding S.B. in closing argument. At one point, while referring to the 1997 incident, the Commonwealth remarked that "[Appellee] got away with it." Although defense counsel immediately objected to this remark, the judge's admonition to the jury arguably worsened the situation. The judge stated, "Ladies and Gentlemen, as far as those earlier charges, in which—that were brought against Mr. Buford, he was not indicted. That's up to you to determine whether you believe that he got away with something or whether he was not guilty of those charges." After the admonition, the prosecution resumed its argument, and at one point, while trying to explain Appellee's strange behavior after the revelation of the new charges, speculated as to his state of mind, saying, "Now he's going to face justice. While he may have been unpunished for the June of 1997 sexual molestation of his niece, he knows that now he is going to have to face justice." The evidence regarding S.B. was pervasive and was a recurring theme of the prosecution's closing argument. We cannot say that its admission did not violate Appellee's substantial rights, therefore it was not harmless error. RCr 9.24.

## B. Adoptive Admission and the Fifth Amendment

■ In addition to its discussion of the prior bad acts evidence, the Court of Appeals noted another ground for reversal, namely, that the testimony of Greg Waldrop regarding a confrontation with Appellee was inadmissible as evidence of an adoptive admission. Our discussion of this matter is somewhat superfluous given our conclusion as to the prior bad acts evidence, nonetheless, we address the merits of the issue because it is likely to recur at retrial.

■ The Court of Appeals correctly rejected the claim of religious privilege, a fact that Appellee acknowledges in his brief. It is clear from the circumstances surrounding the exchange between the two men that details of the confrontation were not privileged simply because Waldrop was a member of the clergy. "For a communication to be covered under this privilege it must be communicated to a member of the clergy when that person is acting as a spiritual advisor and the information is not meant to be transferred to anyone else." *Sanborn v. Commonwealth*, 892 S.W.2d 542, 550 (Ky.1994). Waldrop simply was not acting as a spiritual advisor when he confronted Appellee.

However, the Court of Appeals held that the evidence should have been excluded as a violation of Appellee's privilege against self-incrimination, as guaranteed by both the Fifth Amendment of the United States Constitution and Section Eleven of Kentucky's Constitution. The Court of Appeals raised this issue *sua sponte* and offered it as the sole justification for excluding Waldrop's testimony. This reasoning is faulty, however, and we decline to reverse Appellee's conviction as a result of this alleged error.

The testimony at issue concerned Appellee's interaction with another private citizen—neither the government nor one of its agents was involved at any point in the exchange. Put simply, Appellee was confronted by a friend and colleague over troubling allegations of improper sexual behavior. While it was certainly Appellee's prerogative to refuse to discuss the matter with Waldrop, the Fifth Amendment cannot be used to shield this fact from the jury because constitutional protections against self-incrimination are not triggered absent state action.

In reversing on these grounds, the Court of Appeals primarily relied on *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000), which decided a petition for federal habeas relief and held that the use of "a defendant's pre-arrest silence as substantive evidence of guilt violate[d] the Fifth Amendment's privilege against self-incrimination." *Id.* at 283. The Court reasoned that, "in a pre-arrest setting as well as in a post-arrest setting, it is clear that a potential defendant's comments could provide damaging evidence that might be used in a criminal prosecution; the privilege should thus apply." *Id.* Removed from the context of that case, the court's statements might arguably support the conclusions of the Court of Appeals. However the facts in *Combs* are easily distinguished from those presented here. In *Combs*, the defendant had been apprehended by police at the scene of a shooting and, though he had not been formally arrested or Mirandized, was questioned about the incident. He refused to answer questions, telling police, "Talk to my lawyer." At trial, the defendant's refusal to speak was presented as substantive evidence of his guilt. The Court held that the defendant's pre-arrest silence in the face of questioning by law enforcement personnel was within the protection of the Fifth Amendment and was therefore inadmissible.

In contrast, Appellee's confrontation with Waldrop is in no way analogous to the situation faced by the defendant in *Combs*. Waldrop was a friend and colleague who decided to try to speak with Appellee, at least in part, as a consequence of their relationship. Although Waldrop ultimately testified on behalf of the Commonwealth during both the trial and the grand jury proceedings, there is nothing suggesting he acted on behalf of or in cooperation with the government on the day he confronted Appellee.

 The issue in this case is somewhat complicated by the fact that Appellee's silence in the face of Waldrop's questioning was presented by the Commonwealth as an adoptive admission of Appellee at trial. So-called adoptive admissions were recognized as an exception to the hearsay rule at common law and have since been recognized by our evidence rules. As KRE 801A(b)(2) states in relevant part:

A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is:

. . .

(2) A statement of which the party has manifested an adoption or belief in its truth . . . .

The rule also embraces adoptive admissions through silence, that is, adoption through silence in the face of "statements that would normally evoke denial by the party if untrue." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.20[4], at 595 (4th ed.2003) (footnote citations omitted). In fact, adoptive admissions through silence are "[m]ore prominent than adoptive admissions through conduct . . . ." *Id.* at 594. However,

[s]everal conditions must be satisfied before a statement can be attributed to a party because of silence. A statement may not be admitted as an adoptive admission unless it is established that the party heard and understood the statement and remained silent. Additionally, a statement is not admissible if conditions that prevailed at the time of the statement deprived the party of freedom to act or speak with reference to it.

*Id.* at 595 (4th ed.2003) (footnote citations omitted); *see also Marshall v. Commonwealth,* 60 S.W.3d 513, 521 (Ky.2001) ("When incriminating statements are made in the presence of an accused under circumstances that would normally call for his denial of the statements, and it is clear that the accused understood the statements, yet did not contradict them, the statements are admissible as tacit, or adoptive admissions."). Appellee does not argue that Waldrop's description of their confrontation was inaccurate, nor does he argue that the incident failed to satisfy any of the requisite conditions mentioned above. Rather, he repeats the contention of the Court of Appeals that any negative inference that the jury was permitted to draw from his silence violates his rights under the Fifth Amendment.

While the United States Supreme Court has not yet decided a case in this specific context—the admissibility of an adoptive admission by silence in a pre-arrest setting—it has approved the use of a criminal defendant's silence to establish an adverse inference in certain limited situations. *See, e.g., Fletcher v. Weir,* 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490 (1982) ("In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand. A State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony."); *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980) (holding that where no *Miranda* warnings were given and it was clear that the circumstances did not require them, neither due process nor the privilege against self-incrimination forbids impeachment of a defendant's exculpatory testimony on the basis of his silence prior to arrest).

Moreover, we have held "that Section Eleven of the Constitution of Kentucky and the Fifth Amendment to the Constitution of the United States are coextensive and provide identical protections against self-incrimination. *State action is indispensable.*" *Commonwealth v. Cooper,* 899 S.W.2d 75, 78 (Ky.1995) (emphasis added). Although *Cooper* concerned the admissibility of an employee's statement and confession that had allegedly been coerced by his employer, we see no reason that its logic would not apply to this situation as well. As we have noted, Appellee does not dispute the trial court's determination that his confrontation with Waldrop met all the prerequisites for an adoptive admission through silence, and we have found no reason to question this finding. Likewise, our predecessor court noted that such admissions "derive their competency from the theory and upon the broad principle that the statements were impliedly ratified and adopted by the accused as his own and constituted a tacit admission on his part though an inaudible one. Silence is inferred assent." *Griffith v. Commonwealth,* 250 Ky. 506, 63 S.W.2d 594, 596 (1933) (overruled on other grounds by *Colbert v. Commonwealth,* 306 S.W.2d 825, 827–28 (Ky.1957)). Essentially, Appellee's

failure to respond to Waldrop, insofar as the jury considers it an adoptive admission through silence, has an assertive quality that is not unlike that of the statement by the coerced employee in *Cooper*. As we held in that case, Appellee's privilege against self-incrimination does not justify the suppression of this evidence because there was no state action involved in evoking the response, or rather, lack of response. As such, we reverse the Court of Appeals on this issue insofar as it concluded that the admission of Waldrop's testimony amounted to a violation of Appellee's privilege against self-incrimination.

### III. Conclusion

For the foregoing reasons, the decision of the Court of Appeals is affirmed and the judgment of the McCracken Circuit Court is reversed.

LAMBERT, C.J.; COOPER and JOHNSTONE, JJ., concur.

LAMBERT, C.J., also concurs by separate opinion.

GRAVES, J., dissents by separate opinion in which SCOTT and WINTERSHEIMER, JJ., join.

LAMBERT, Concurring Chief Justice.

While I concur with part IIA of the majority opinion, I write separately to comment on the treatment of adoptive admissions in part IIB.

I agree that introduction of the evidence of Appellee's silence when he was confronted by Waldrop does not amount to a violation of the Fifth Amendment of the Constitution of the United States or Section 11 of the Constitution of Kentucky. To that extent, the majority has correctly decided the issue. However, I take issue with the discussion of adoptive admissions, KRE 801 A(b)(2). Of all the exceptions to the hearsay rule, in my judgment, none is more unreliable or pregnant with ambiguity than adoptive admissions. The theory behind adoptive admissions is that one who is wrongly accused will deny his guilt immediately, and upon his failure of denial, evidence of silence may be introduced as evidence of guilt. Such a view presupposes that all human beings respond similarly to the stress of accusation. I do not believe that to be true; hence my conclusion that such evidence is often unreliable.

I recognize that KRE 801 A(b)(2) has been interpreted to embrace adoptive admissions through silence. "Silence is inferred assent. If innocent, a reaction and declaration may rationally be expected of him rather than a tame submission."[1] Professor Lawson has recognized that silence in the face of a statement is never free of ambiguity and noted that courts and commentators have urged caution in the use of admissions through silence.[2] While I do not suggest overruling our cases on this issue, because of the powerful nature of such evidence, and the dubious reliability associated with it, trial judges should guard against any possible abuse and hold the admissibility of such evidence to exacting standards.

GRAVES, Dissenting Justice.

Respectfully, I dissent from part A of the majority opinion. As explained by the majority, evidence of *modus operandi* may be used to prove the elements of a subsequent offense if the facts surrounding the prior misconduct are so "strikingly similar to the charged offense as to create a rea-

1. *Griffith v. Commonwealth*, 250 Ky. 506, 63 S.W.2d 594, 596 (1933).

2. ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 8.20(4), at 594 (4th ed.2003)

sonable probability that (1) the acts were committed by the same person, and/or (2) the acts were accompanied by the same *mens rea.*" *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999). The "strikingly similar" requirement does not necessitate the facts to be identical in all respects. *Dickerson v. Commonwealth,* 174 S.W.3d 451, 469 (Ky.2005). In this case, the prior bad acts evidence was offered to prove that the crimes did, in fact, occur (the *corpus delicti*) by demonstrating a *modus operandi. See id.* at 468–69.

There are numerous similarities of fact surrounding the charged instances of sexual abuse and S.B.'s prior bad acts testimony. All three of the victims were females under the age of consent. All of the acts were committed during an "outing" of some sort, while the victims went to sleep at night with Appellee lying next to them. Although S.B. was related to Appellee where J.R. and H.S. were not, all three victims were close to Appellee and were in a position of trust and vulnerability to him.

The facts surrounding the allegations of abuse also differ, and as the majority notes, attorneys on each side will invariably produce lists of similarities and dissimilarities between the prior bad acts and the present facts. However, it is the trial court's function to weigh and evaluate these facts when making its ruling, and this Court should not disturb such a ruling absent an abuse of discretion. *Matthews v. Commonwealth,* 163 S.W.3d 11, 19 (Ky. 2005). In weighing the similarities and differences between the instances of abuse, the trial court did not abuse its discretion in admitting the evidence. *Cf. Dickerson, supra,* at 468 (Evidence of a prior act of sodomy was inadmissible where victim "did not testify to any facts constituting the sexual offenses," and did not even testify as to where the acts occurred). The trial court is entitled to deference in this

regard, and therefore, I would reverse the Court of Appeals and affirm Appellee's conviction.

SCOTT, and WINTERSHEIMER, JJ., join this dissent.